590 F.2d 514
 PUBLIC FUNDS FOR PUBLIC SCHOOLS OF NEW JERSEY, American
Civil Liberties Union of New Jersey, Inc., Americans for
Democratic Action, New Jersey Region of American Jewish
Congress, Americans United for Separation of Church and
State, Trenton Area Chapter of Americans United for
Separation of Church and State, Ethical Culture Society of
Bergen County, National Council of Jewish Women, New Jersey
Congress of Parents and Teachers, New Jersey Education
Association, Society of Separationists, New Jersey Chapter,
Teaneck Citizens for Public Schools, Union of American
Hebrew Congregations, Gilbert S. Barnes, Linda B. Cappelson,
Fred E. Clever, Susan P. Coen, Warren D. Cummings, Rita
D'Joseph, John H. Ford, Ruth D. Glick, David Goldberg,
Lawrence Haas, John C. Hazen, Alexander H. Holman, John
Pintard Horchner, W. Clifford Jones, Merle H. Kalishman,
Judith S. Knee, Libby B. Korenstein, Wendy F. Korenstein, Jo
Kotula, Phyllis A. Minch, Edna B. Norris, Allan S. Olsen,
Donald C. Osborne, Rose PauDN No. 78-1218.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 5, 1978.
Decided Jan. 12, 1979.
 
 John J. Degnan, Atty. Gen. of New Jersey, Stephen Skillman, Asst. Atty. Gen., of counsel and on the brief, Mark Schorr, Deputy Atty. Gen., on the brief, Trenton, N. J., for appellants.
 Samuel M. Koenigsberg, Montclair, N. J., Leo Pfeffer, New York City, for appellees.
 James P. Beggans, Jr., pro se.
 Before ROSENN and WEIS, Circuit Judges, and HANNUM, District Judge.*
 OPINION OF THE COURT
 ROSENN, Circuit Judge.
 
 
 1
 This case presents recurring and troublesome questions concerning the relationship between religion and government. The occasion for our consideration of these questions is a challenge, under the Establishment Clause of the Federal Constitution, to the State of New Jersey's recent enactment of its first general income tax law which includes tax relief to parents of children attending nonpublic schools.
 
 
 2
 The commands and guarantees of the first amendment to the Federal Constitution enabling Americans to assemble freely, speak freely, publish freely, and worship freely created the quintessence of a unique and open society which characterized the quality of our Republic. The amendment also "underwrote the admonition of Thomas Jefferson that there should be a wall of separation between church and state."[1] In recent years, the Supreme Court succinctly described the attitude of the state to the relationship between man and religion in our society in these words:
 
 
 3
 The place of religion in our society is an exalted one, achieved through a long tradition of reliance on the home, the church and the inviolable citadel of the individual heart and mind. We have come to realize through bitter experience that it is not within the power of government to invade that citadel, whether its purpose or effect be to aid or oppose, to advance or retard. In the relationship between man and religion, the State is firmly committed to a position of neutrality.
 
 
 4
 Abington School District v. Schempp, 374 U.S. 203, 226, 83 S.Ct. 1560, 1574, 10 L.Ed.2d 844 (1963).[2]
 
 I.
 
 5
 In 1976 New Jersey instituted a general income tax, which included among its many sections this provision:
 
 
 6
 (b) Additional exemptions. In addition to the personal exemptions allowed in (a), the following additional personal exemptions shall be allowed as a deduction from gross income:
 
 
 7
 2. For each dependent who qualifies as a dependent of the taxpayer during the taxable year for Federal income tax purposes $1,000.00 plus, for each dependent child attending on a full-time basis an elementary or secondary institution not deriving its primary support from public moneys $1,000.00.
 
 
 8
 N.J.S.A. 54A:3-1(b)(2) (West Supp.1977). This exemption for dependents in nonpublic schools is one of several $1,000 exemptions for which a taxpayer might be eligible. Beside a $1,000 personal exemption, a taxpayer can claim additional $1,000 exemptions if he or she has a spouse, if the taxpayer or spouse is 65 or older, if the taxpayer or spouse is blind or disabled, or if a dependent of the taxpayer attends a college or university and receives from the taxpayer at least half the costs of tuition and maintenance. N.J.S.A. 54A:3-1(b)(1)-(6), 54A:3-1.1 (West Supp.1977).
 
 
 9
 Contending that the exemption for dependents in nonpublic elementary or secondary schools violates the Establishment Clause of the first amendment, several organizations interested in the relation of church and state, as well as several individual taxpayers, sued in the United States District Court for the District of New Jersey seeking declaratory and injunctive relief.[3] They named as defendants the Governor of New Jersey, the state's Director of Taxation, and the Commissioner of Education (collectively "the State" or "New Jersey").
 
 
 10
 No testimony was presented, and the learned district court characterized its findings of fact as "undisputed." Public Funds for Public Schools v. Byrne, 444 F.Supp. 1228, 1229 (D.N.J.1978). The court found that of the 753 nonpublic elementary and secondary schools in New Jersey, 714 (or almost 95 percent) are religiously affiliated. Upon the assumption that most children from New Jersey attending private or parochial schools go to schools within the state, the court concluded that "only a few such children attend a school that is not religiously affiliated." Id. at 1229-30. Reasoning that the provision under attack rewards the enrollment of children in religiously affiliated schools, the district court held that "this income tax reduction provision has the direct effect of aiding religion" and that the law, on its face, contravenes the Establishment Clause of the first amendment. Id. at 1231. An additional ground for the court's decision was that the provision "would enmesh New Jersey in continuing political strife over aid to religion, thereby engaging the government of New Jersey in excessive entanglement with religion." Id. (citation omitted).
 
 
 11
 The State appealed from the decision of the district court. We affirm.
 
 II.
 
 12
 The first amendment, which the fourteenth amendment makes binding on the states through its Due Process Clause, Everson v. Board of Education,330 U.S. 1, 8, 67 S.Ct. 504, 91 L.Ed. 711 (1947), prohibits any law " respecting an establishment of religion."[4] In ruling upon challenges to statutes as violative of the Establishment Clause, the Supreme Court has during this decade carved out three standards. To satisfy the Constitution, a challenged law (1) "must have a secular legislative purpose"; (2) must have, as its "principal or primary effect," neither the advancement nor inhibition of religion; and (3) must avoid excessive governmental entanglement with religion. See Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971).[5]
 
 
 13
 In addition to the general guidance of these standards, the Court has delivered two major decisions that deal specifically with tax relief challenged on grounds of the Establishment Clause. In Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), the Court upheld a law exempting from taxes real property owned by religious organizations and used for religious worship. The same law also exempted property used for charitable or educational purposes. On the other hand, in Committee for Public Education v. Nyquist, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973), the Court struck down a measure for relief of taxpayers who supported dependents in nonpublic elementary or secondary schools. For each such dependent a taxpayer could deduct from his gross income an amount graduated according to his earnings. In New York, which had passed the law, 85 percent of nonpublic schools were religiously affiliated. Because the provision in question thus had the primary effect of advancing religion, the Court declared it to be unconstitutional.
 
 
 14
 Our task is to apply to New Jersey's provision the three standards that the Court has extracted from the Establishment Clause. Using these standards, we must decide whether the State's $1,000 exemption for those supporting dependents in nonpublic elementary and secondary schools is closer to the exemption from taxes sustained in Walz or to the tax relief invalidated in Nyquist.
 
 
 15
 As for the first standard, we conclude that the exemption meets the requirement of secular purpose. In seeking to promote educational pluralism and to relieve some of the burden on public schools in reducing the number of students whom the public schools were required to educate, New Jersey aimed at sufficient secular ends. See Committee for Public Education v. Nyquist, supra, 413 U.S. at 773, 93 S.Ct. 2955. This was virtually conceded in the district court, but as Judge Meanor observed, the plaintiffs raised the issue in order to preserve it in the event of Supreme Court review.
 
 
 16
 The exemption, however, encounters an insurmountable obstacle in the second standard that the "principal or primary effect" of the tax benefit be neither the advancement nor inhibition of religion. In Nyquist, a taxpayer supporting a dependent in a nonpublic elementary or secondary school could claim tax relief graduated according to the taxpayer's income; here, such a taxpayer can take a $1,000 deduction, whatever his income may be. Despite this difference in the form of relief, the taxpayer in each instance "is allowed to reduce by an arbitrary amount the sum he would otherwise be obliged to pay over to the State." Id. at 791, 93 S.Ct. at 2974. Because the great majority of eligible taxpayers secure this tax relief by virtue of supporting dependents in religiously affiliated elementary or secondary schools, the " 'money involved represents a charge made upon the state for the purpose of religious education.' " Id., quoting Committee for Public Education v. Nyquist, 350 F.Supp. 655, 675 (S.D.N.Y.1972) (three-judge district court) (Hays, J., concurring in part in the result, dissenting in part). Under Nyquist we are compelled to find unconstitutional this exemption for the taxpayer who supports a dependent in nonpublic elementary or secondary schools.
 
 
 17
 The Court in Nyquist distinguished on three grounds the exemption upheld in Walz. On two of these grounds, New Jersey's exemption is clearly closer to the law in Nyquist, than it is to the law in Walz. Like the statute in Nyquist, New Jersey's tax benefit cannot claim the long history of acceptance, extending back to colonial times, which characterized the exemption from property taxes upheld in Walz for houses of worship. See 413 U.S. at 792, 93 S.Ct. 2955. Furthermore, the Nyquist Court observed that the reason underlying the history of tolerance of tax exemptions for houses of worship was the recognition that taxation could be one form of hostility toward religion and that actual exemption from taxation constituted "a reasonable and balanced attempt to guard against those dangers." See 413 U.S. at 793, 93 S.Ct. at 2975, quoting Walz, 397 U.S. at 673, 90 S.Ct. 1409. Like the statute in Nyquist, New Jersey's exemption does not relieve religious organizations from the threat of "hostile" taxation, as did the complete exemption from property taxes of places of worship in Walz. See 413 U.S. at 793, 93 S.Ct. 2955.
 
 
 18
 New Jersey places great reliance on the third ground by which the Court distinguished Nyquist from Walz. In Nyquist the Court wrote:
 
 
 19
 The exception challenged in Walz was not restricted to a class composed exclusively or even predominantly of religious institutions. Instead, the exemption covered all property devoted to religious, educational, or charitable purposes. As the parties here must concede, tax reductions authorized by this law flow primarily to the parents of children attending sectarian nonpublic schools.
 
 
 20
 413 U.S. at 794, 93 S.Ct. at 2976. The breadth of the class benefited by a law is an important criterion by which to judge constitutionality. Because the first amendment does not proscribe laws having only incidental advantages for religion, See Walz v. Tax Commission, 397 U.S. at 671-72, 90 S.Ct. 1409, breadth in the benefited class helps to guarantee that the advantages to religious institutions will indeed be incidental to secular ends and effects.[6] In this case, the State argues that its tax exemption is part of a comprehensive scheme, under which it has granted tax benefits for those likely to incur "added expenses." Among the beneficiaries of relief are taxpayers with dependents in college, taxpayers who are blind or disabled, married taxpayers, and taxpayers 65 or older.
 
 
 21
 Nyquist could not be distinguished solely on the ground that there are these other exemptions in the New Jersey income tax law. In Nyquist the state of New York also added the challenged tax relief to existing exemptions for a taxpayer's supporting dependents, having a spouse, being blind or having a blind spouse, and being 65 or older or having a spouse 65 or older.[7] The tax benefits for support of dependents in nonpublic schools were nevertheless held to be unconstitutional. That New Jersey adopted all of its exemptions and deductions at once, rather than adding the challenged exemption to an existing tax code, as did New York state, might disprove any sectarian intent; it does not, however, reveal that the effects in this case differ from the effects considered in Nyquist.
 
 
 22
 New Jersey, however, resourcefully offers another suggestion by which the additional exemptions in its income tax law may be sustained. The State insists that the challenged exemption fits into a scheme of congruent $1,000 exemptions, as distinguished from the tax relief in Nyquist which was different in form and amount from other exemptions, deductions, and modifications allowed by New York law. This distinction between the tax laws of New York and New Jersey, the State argues, permits its exemption to be considered as part of a broad block of exemptions, benefiting a far larger class than those affected specifically by the particular provision questioned in this case. That class, contends the state, consists of taxpayers who are likely to have "added expenses."
 
 
 23
 A challenge brought under the Establishment Clause demands a close examination of how the legislature has drawn its statutory classifications. Cf. Kosydar v. Wolman, 353 F.Supp. 744, 753-54 (S.D.Ohio 1972) (three-judge court) (classifications that disproportionately benefit religion called " highly suspect"), Aff'd mem. sub nom. Grit v. Wolman, 413 U.S. 901, 93 S.Ct. 3062, 37 L.Ed.2d 1021 (1973). The State defends the lines it has drawn by analogizing its relief for taxpayers' "added expenses" to the relief from property taxes considered in Walz an exemption from taxation of property devoted to religious, charitable, and educational purposes. The law in Walz encompassed a wide range of "entities . . . that foster (the community's) 'moral or mental improvement,' " and was therefore quite comprehensive. 397 U.S. at 672-73, 90 S.Ct. at 1413. But New Jersey left significant gaps when it created the specific $1,000 exemptions to relieve taxpayers of the burden of " added expenses." Parents supporting children in public elementary or secondary schools are denied the additional benefit of the challenged exemption. See Committee for Public Education v. Nyquist, 413 U.S. at 782 n.38, 93 S.Ct. 2955.[8] Even if parents of dependents in nonpublic schools do have greater expenses than those supporting dependents in public schools, the State may not "equalize" the burden by granting a benefit only to taxpayers with dependents in private or parochial schools.[9] Nyquist explicitly forecloses the argument that the State may deny an exemption to the parents of students in public schools but may grant an exemption to parents of students in nonpublic schools, on the supposition that this differing treatment may tend to equalize the two classes of parents in their educational expenditures. See id.[10]
 
 
 24
 Inasmuch as New Jersey's exemption denies to parents of public school students a benefit granted to parents of students in nonpublic schools, the exemption is not saved because a similar provision applies to parents of college and university students, including those in public institutions. See N.J.S.A. 54A:3-1.1 (West Supp.1977). The State maintains that this similar provision makes the class benefited here broader than the favored class in Nyquist, but the beneficial provision for collegiate education does not correct the disparate treatment for elementary and secondary levels of education.
 
 
 25
 We must therefore hold that New Jersey's exemption for taxpayers who support dependents in nonpublic elementary or secondary schools is not a neutral approach to religion; it does not encompass a comprehensive system of educational exemptions. The law in Walz, by way of contrast, met the requirements of neutrality as to religion because the exemption for property taxes was part of a comprehensive scheme of charitable and educational exemptions.[11]
 
 
 26
 Finally, the State has sought to distinguish Nyquist by one other argument. In Nyquist, New York had not only provided tax relief in support of dependents in nonpublic schools, but in a separate section of the same law the legislature had granted reimbursements to some taxpayers for the tuition paid to private and parochial schools. The tax benefits were "designed to provide a form of relief to those who fail to qualify for tuition reimbursement." 413 U.S. at 765, 93 S.Ct. at 2961. Observing that the Court in Nyquist found the two provisions "legally inseparable," Id. at 791 n.50, 93 S.Ct. 2955, New Jersey now argues that its law, which grants no reimbursements, is not subject to the strictures of Nyquist. But in describing the tax relief and the reimbursements as "legally inseparable," the Court was not expressing the view that the tax relief was invalid because reimbursements were conferred by the same statute. Instead, the Court found that the provisions for tax relief and for reimbursements each independently violated the Constitution, and that they were unconstitutional for the same reasons: ". . . (U)nder the facts of this case, the two are legally inseparable and. . . if § 2 (concerning reimbursements) does violate the Establishment Clause So, too, do the sections conferring tax benefits." Id. (emphasis deleted and supplied).
 
 
 27
 We hold that the exemption has a primary effect of advancing religion and therefore violates the first amendment. In view of this conclusion, we need not reach the third standard the test of entanglement which the Court also has applied to laws challenged under the Establishment Clause.
 
 
 28
 The judgment of the district court will be affirmed. Costs taxed against the appellants.
 
 
 29
 WEIS, Circuit Judge, concurring.
 
 
 30
 When New Jersey was required to find a new method of financing its educational system, it chose to impose a graduated income tax. In formulating the levy, the legislature recognized that parents who send their sons and daughters to nonpublic schools spare the state and its taxpayers the not inconsiderable expense of educating these children a cost that would otherwise be incurred in fulfilling the state's obligation to provide a free primary and secondary education. Consequently, those parents were found to be entitled to special consideration under the new educational tax statute. They were allowed to exclude $1,000 from their gross income for each child in attendance at a nonpublic school. As the majority opinion details, other provisions have not been challenged by the plaintiffs, who have singled out for attack the exemption to parents of children attending nonpublic grade and high school.
 
 
 31
 It bears repeating that what is involved here is not a grant of money or other form of direct aid to nonpublic schools. It is simply an exclusion of an amount of money from gross income resulting in a lowering of the parents' tax bill. In the case of a parent earning $20,000, the total savings would be $20 certainly a trivial amount compared to what it would cost New Jersey to educate a child in the public school system.
 
 
 32
 Plaintiffs' objection to this tax measure is that it advances religion because most of the nonpublic schools are sectarian. The argument is that the parent is rewarded for sending his children to nonpublic schools, thus representing a charge made upon the state for the purpose of promoting religious education. Committee for Public Education v. Nyquist, 413 U.S. 756, 790-91, 93 S.Ct. 2955, 2974, 2975, 37 L.Ed.2d 948 (1973). It is easy to fault this reasoning, both in its theoretical premises as well as its unrealistic point of view, but extended discussion would accomplish little at this point. I have great difficulty, however, in understanding why the exclusion here is more of an aid to religion than a direct contribution to a church, synagogue, temple or mosque which is deductible under the Internal Revenue Code. See I.R.C. § 170, 26 U.S.C. § 170 (1976). It is all the more puzzling because the benefits the state receives from the continued operation of a congregation are not as directly recognizable nor financially calculable as the education received by nonpublic school children.
 
 
 33
 Although New Jersey has no obligation to furnish religious facilities to its citizens, indeed is prohibited from doing so, it has assumed the responsibility of educating its children. Yet the state's financial burden is lessened whenever parents send their child to a nonpublic school. There is therefore more justification for permitting the school tax deduction than the charitable deduction, at least from the standpoint of advancing the governmental interest.
 
 
 34
 Aside from this inconsistency,[1] doctrinal variances also may be found in recent Establishment Clause pronouncements of the Supreme Court. Certainly, the property tax exemption at issue in Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), produced a direct and measurable benefit to religious organizations, but that was not enough to require invalidity. Here, by contrast, the benefit is indirect and uncertain.
 
 
 35
 An analysis of the cases touching upon state assistance to nonpublic schools could proceed at length, but would merely illustrate the lack of a principled and logical thread. The reality is that the Supreme Court has marked out a series of boundaries and points of departure on an ad hoc basis.[2] Thus, school books may be loaned to pupils, Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), but weather charts may not, Wolman v. Walter, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977). Busses may be provided to allow for transportation of pupils to school, Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), but not for field trips to courthouses or museums, Wolman v. Walter, supra. Financial aid for the construction of buildings may be given to colleges, Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), but grants to provide needed maintenance to parochial schools in slum neighborhoods are forbidden, Committee for Public Education v. Nyquist, supra.
 
 
 36
 In many of the opinions in this area, I am struck by the frequent use of the metaphor that the first amendment was intended to erect a "wall" between church and state. E.g., Committee for Public Education v. Nyquist, supra at 761, 93 S.Ct. 2955; Everson v. Board of Education, supra at 16, 67 S.Ct. 504. Insofar as this concept expresses a guiding principle for constitutional adjudication, I find it unfortunate and historically inaccurate.
 
 
 37
 My first reservation is semantical. So often a wall implies fear and hostility, as the infamous structure separating East and West Berlin so dramatically demonstrates. No such emotions should dominate the relationship between government and religion and the use of a metaphor that encourages such concepts is not desirable.
 
 
 38
 A more fundamental objection, however, is grounded in the history of the Establishment Clause. Although an accurate description of the Framers' intent is beyond our grasp,[3] it is dubious that the Madisonian-Jeffersonian concept of absolute separation was widely accepted by the draftsmen. See 2 J. Story, Commentaries on the Constitution of the United States §§ 1871-1879 (5th ed. 1891).
 
 
 39
 Commenting upon the checkered constitutional history of the Establishment Clause, one scholar has noted:
 
 
 40
 "(I)t remains at best ironic and at worst perverse to appeal to the history of the establishment clause to strike at practices only remotely resembling establishment in any core sense of the concept." L. Tribe, American Constitutional Law § 14-3 at 819 (1978).
 
 
 41
 Yet, that is what has been done in using the "wall" concept to justify a policy of judicial hostility towards state aid to nonpublic schools.
 
 
 42
 Perhaps a more accurate appraisal of the purpose of the first amendment is that the state is to be neutral in its relationship with religion. And so if a particular legislative enactment, particularly in the field of taxation, provides clearly observable secular benefits, then religious institutions should not be barred solely because of their status. See Walz v. Tax Commission, supra ; Giannella, Religious Liberty, Nonestablishment, and Doctrinal Development: Part II. The Nonestablishment Principle, 81 Harv.L.Rev. 513, 544-54 (1968).
 
 
 43
 Finally, constitutional adjudication requires that the courts read a particular clause with its historical context in mind, lest the fears and prejudices of an earlier age serve to distort the problems of today. As Justice Powell, who wrote the Nyquist opinion, noted some four years later:
 
 
 44
 "It is important to keep these issues in perspective. At this point in the 20th century we are quite far removed from the dangers that prompted the Framers to include the Establishment Clause in the Bill of Rights. See Walz v. Tax Comm'n, 397 U.S. 664, 668 (90 S.Ct. 1409, 25 L.Ed.2d 697) (1970). The risk of significant religious or denominational control over our democratic processes or even of deep political division along religious lines is remote, and when viewed against the positive contributions of sectarian schools, any such risk seems entirely tolerable in light of the continuing oversight of this Court. Our decisions have sought to establish principles that preserve the cherished safeguard of the Establishment Clause without resort to blind absolutism." Wolman v. Walter, supra 433 U.S. at 263, 97 S.Ct. at 2613 (Powell, J., concurring in part, dissenting in part).
 
 
 45
 These cases require a realistic approach, not an exaggerated response to nonexistent threats. Simple justice would require that the court honor the decision of the New Jersey legislature where the Quid pro quo weighs heavily in favor of the state. But as the majority correctly concludes, the narrow legal issue in this case is whether Nyquist or Walz governs. Although it seems to me that the dissenters have far the better of it in the Nyquist opinions, I cannot in all intellectual honesty say that case differs from the one Sub judice. I am bound to follow the holding of the majority of the Supreme Court and I therefore concur, albeit reluctantly, in the judgment of the court.
 
 
 
 *
 Honorable John B. Hannum, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 Earl Warren, A Republic If You Can Keep It 117 (1972)
 
 
 [2]
 As Mr. Justice Brennan wrote in his concurrence in Schempp, "(t)he State must be steadfastly neutral in all matters of faith, and neither favor nor inhibit religion." 374 U.S. at 299, 83 S.Ct. at 1612
 
 
 [3]
 The defendants have not disputed the plaintiffs' standing to bring this action. The individual plaintiffs, as taxpayers, have standing under Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), and the organizations, whose members are taxpayers, have standing under Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). See Public Funds for Public Schools v. Marburger, 358 F.Supp. 29, 31-32 (D.N.J.1973), Aff'd mem. 417 U.S. 961, 94 S.Ct. 3163, 41 L.Ed.2d 1134 (1974)
 
 
 [4]
 The late Mr. Justice Black, author of the Everson opinion, also perceptively wrote:
 The First Amendment is truly the heart of the Bill of Rights. The framers balanced its freedom of religion, speech, press, assembly and petition against the needs of a powerful central government, and decided that in those freedoms lies this nation's only true security.
 The Great Rights 63 (E. Cahn ed. 1963).
 
 
 [5]
 The court has cautioned that these standards "are no more than helpful signposts." Hunt v. McNair, 413 U.S. 734, 741, 93 S.Ct. 2868, 2873, 37 L.Ed.2d 923 (1973)
 
 
 [6]
 The analysis required in cases concerning the Establishment Clause has been compared to the adjudication of equal protection cases. Walz v. Tax Commission, 397 U.S. at 696-97, 90 S.Ct. 1409 (Harlan, J., concurring); Kosydar v. Wolman 353 F.Supp. 744, 753 (S.D.Ohio 1972) (three-judge court), Aff'd mem. sub nom. Grit v. Wolman, 413 U.S. 901, 93 S.Ct. 3062, 37 L.Ed.2d 1021 (1973)
 The Court has also observed that if the class benefitted by a statute is broad, political division along religious lines becomes less likely. The possibility of such divisions could bear on whether a law threatens to entangle church and state. Committee for Public Education v. Nyquist, 413 U.S. at 794, 796 n.54, 93 S.Ct. 2955. Because New Jersey's law fails the test of its "effects," we need not reach the issue of entanglement between church and state.
 
 
 [7]
 See N.Y.Tax Law § 362 (McKinney 1975). These provisions have remained unchanged since 1959 and were in effect when Nyquist was decided
 
 
 [8]
 Cf. Minn. Civ. Lib. Union v. Roemer, 452 F.Supp. 1316, 1322 (D.Minn.1978) (deduction available to parents of public school children, as well as to parents of children in private or parochial schools)
 
 
 [9]
 On the ground that the tax benefit in Nyquist did not extend to parents of all school children, the Court distinguished Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (state bears expense of transporting all students to school, whether school public or nonpublic), and Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) (textbooks lent to all students, whether in public or nonpublic schools). See Committee for Public Education v. Nyquist, 413 U.S. at 782 n.38, 93 S.Ct. 2970
 
 
 [10]
 Footnote 38 in Nyquist, which treats this question, referred to reimbursements for tuition, but the same reasoning applies both to reimbursements and to tax benefits. The Court wrote: "We do not agree with the suggestion in the dissent of The Chief Justice that tuition grants are an . . . endeavor to provide comparable benefits to all parents of schoolchildren whether enrolled in public or nonpublic schools. . . . The grants to parents of private school children are given in addition to the right they have to send their children to public schools 'totally at state expense.' " 413 U.S. at 782 n.38, 93 S.Ct. at 2970. The same rationale governs this case
 
 
 [11]
 The Supreme Court has reserved the question whether "a genuine tax deduction, such as for charitable contributions," would satisfy the neutrality test in Walz. Committee for Public Education v. Nyquist, supra, 413 U.S. at 790 n.49, 93 S.Ct. at 2974. As we interpret the phrase "genuine tax deduction," it refers to the comprehensiveness of the tax relief granted by a challenged statute. Because New Jersey's scheme is insufficiently comprehensive, the law questioned in this case does not create a "genuine tax deduction."
 
 
 [1]
 Although the Court has yet to pass on the constitutionality of the charitable deduction, See Committee for Public Education v. Nyquist, supra at 790 n.49, 93 S.Ct. 2955, the practice's long history and widespread social acceptance would seem to point towards its validity, See Helvering v. Bliss, 293 U.S. 144, 147, 55 S.Ct. 17, 79 L.Ed. 246 (1934)
 
 
 [2]
 See Young, Constitutional Validity of State Aid to Pupils in Church Related Schools Internal Tension between the Establishment and Free Exercise Clauses, 30 Ohio St. L.J. 783 (1977)
 
 
 [3]
 The debates themselves are inconclusive. See generally 2 B. Schwartz, The Bill of Rights: A Documentary History 1051-52, 1088-90 (1971)