RHODE ISLAND FEDERATION OF TEACHERS, AFL–CIO, et al.

v.

John H. NORBERG, in his capacity as Tax Administrator of the State of Rhode Island.

Civ. A. No. 79–0429.

United States District Court, D. Rhode Island.

Nov. 16, 1979.

Julius C. Michaelson, Lynette Labinger, Providence, R.I., Natale L. Urso, Thomas J. Liguori, Jr., Westerly, R.I., for plaintiffs.

William G. Brody, Asst. Atty. Gen., John S. Foley, Sp. Asst. Atty. Gen., William T. Murphy, Providence, R.I., Robert M. Andersen, Milwaukee, Wis., for defendant.

## OPINION

PETTINE, Chief Judge.

This case raises a challenge under the Free Exercise and Establishment Clauses of the First Amendment to the constitutionality of R.I.G.L. § 44–30–12(c)(2) as amended.[1] The law provides for deductions from gross income under the Rhode Island Income Tax Act for amounts paid by parents and guardians for their dependents' tuition, textbooks (including instructional materials and equipment), and transportation. As used in the statute, "textbooks" specifically excludes instructional books and materials used in the teaching of religious tenets, doctrines or worship. The benefits of the statute are available equally to parents whose children attend public as well as private elementary and secondary schools in any of the New England states.

The plaintiffs, a number of organizations and individual taxpayers, seek declaratory

---

1. R.I.G.L. § 44–30–12(c)(2) reads as follows:

(c) Modifications Reducing Federal Adjusted Gross Income.—There shall be subtracted from federal adjusted gross income . . . (2) amounts paid to others, not to exceed five hundred ($500) dollars for each dependent in kindergarten through sixth grade and seven hundred ($700) dollars for each dependent in grades seven through twelve inclusive, for tuition, textbooks, and transportation of each dependent attending an elementary or secondary school situated in Rhode Island, Massachusetts, Connecticut, Vermont, New Hampshire, or Maine, wherein a resident of this state may legally fulfill the state's com-

pulsory attendance laws, which is not operated for profit, and which adheres to the provisions of the Civil Rights Act of 1964. As used in this section, "textbooks" shall mean and include books and other instructional materials and equipment used in elementary and secondary schools in teaching only those subjects legally and commonly taught in public elementary and secondary schools in this state and shall not include instructional books and materials used in the teaching of religious tenets, doctrines, or worship, the purpose of which is to inculcate such tenets, doctrines or worship.

and injunctive relief pursuant to 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution. Plaintiffs have obtained a temporary restraining order preventing the defendant, the Tax Administrator of the State of Rhode Island, from taking any steps to prepare or print forms and instructions for the 1979 income tax returns that incorporate, refer or relate to the challenged deductions contained in the Act, and from permitting any taxpayer to claim deductions thereunder on 1979 tax returns. The Order has remained in effect pending entry of the decision and judgment of the Court. The matter is now before the Court for decision on the merits.

Based on a hearing and documentary evidence, the Court makes the following findings of fact. Of the 29,066 tuition-paying children who attend nonpublic schools in Rhode Island, over 94% attend sectarian schools.[2] The total number of students attending public schools in Rhode Island on an other than tuition-free basis is 321 students.[3] Combining the foregoing figures, 93.4% of the children attending school in Rhode Island whose parents are eligible for the challenged tuition deductions attend sectarian schools.

Since the Act applies equally to taxpayers whose children are enrolled in elementary and secondary schools in the other five New England states, those enrollment figures would also be pertinent. No data seem to exist, however, that indicate either the number of Rhode Island children attending school outside the state or whether this number is large or small in relation to the number attending school within the state. Uncontroverted evidence does exist that at least 79% of the students enrolled in private schools in New England attend sectarian institutions.[4] In the absence of contrary evidence, the Court believes that a reasonable inference can be drawn that the percentage of Rhode Island children attending sectarian schools in New England is consistent with this figure. In any event, the Court doubts that the number of Rhode Island children attending school in the other New England states is sufficient to significantly alter the conclusion that the overwhelming majority of parents eligible for the challenged tuition deduction send their children to sectarian schools. *Accord, Public Funds for Public Schools v. Byrne*, 444 F.Supp. 1228, 1229 (D.N.J.1978), aff'd, 590 F.2d 514 (3d Cir.), aff'd mem., —— U.S. ——, 99 S.Ct. 2818, 61 L.Ed.2d 273 (1979).

No evidence has been submitted concerning transportation or textbook costs incurred by parents.

## I. The First Amendment

Once again this Court is faced with the difficult and sensitive task of examining a Rhode Island statute within the framework of the religion clauses of the First Amendment. Although the Supreme Court and various commentators have devoted countless pages to discussions of the philosophical and historical underpinnings of these two clauses, they remain peculiarly immune from precise definition. The result has been that the Supreme Court's decisions in this area have, by the Court's own admission, reflected "considerable internal inconsistency." *Walz v. Tax Commission*, 397 U.S. 664, 668, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). These inconsistencies, perplexing even to constitutional experts, are particularly evident in the area of state aid to parochial schools, where, for example, the

---

**2.** A survey conducted by the plaintiffs and submitted into evidence indicates that enrollment figures for the fall of 1979 were 27,397 students attending nonpublic sectarian schools and 1,669 students attending nonpublic nonsectarian schools. Of the students attending sectarian schools, the breakdown was as follows: Roman Catholic (24,983); Society of Friends (1,089); Episcopal (396); Jewish (286); Fundamentalist (154); Lutheran (101); Baptist (73); unspecified (315).

**3.** The most current figures available are those for the 1978-79 school year. These figures reveal that there were 37 tuition-paying students enrolled in Rhode Island public schools and 284 tuition-paying students enrolled in the Henry Barnard School, an elementary school operated within Rhode Island College by the State of Rhode Island.

**4.** See National Center for Education Statistics, *Nonpublic School Statistics, 1976–77.* (Plaintiffs' Exhibit J–1).

Court has made such fine distinctions as that between permissible state aid for textbooks, *Board of Education v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), and impermissible aid for maps, *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975).

Despite the inconsistencies and fine distinctions made by the Supreme Court, certain broad principles have emerged from the cases. Most important have been the principles that "the state should not become involved in religious affairs and that sectarian differences should not be allowed to fragment the body politic." Tribe, *American Constitutional Law* at 819. These principles, which trace their roots to James Madison's Memorial and Remonstrance, developed in response to the situation in the American colonies in which government-established religions led to cruel persecutions against nonbelievers. Justice Black, writing in *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), depicted the situation in the colonies as follows:

> A large proportion of the early settlers of this country came here from Europe to escape the bondage of laws which compelled them to support and attend government favored churches. . . .
>
> These practices of the old world were transplanted to and began to thrive in the soil of the new America. The very charters granted by the English Crown to the individuals and companies designated to make the laws which would control the destinies of the colonials authorized these individuals and companies to erect religious establishments which all, whether believers or nonbelievers, would be required to support and attend. An exercise of this authority was accompanied by a repetition of many of the old world practices and persecutions. Catholics found themselves hounded and proscribed because of their faith; Quakers who followed their conscience went to jail; Baptists were peculiarly obnoxious to certain dominant Protestant sects . . . . ..
>
> And all of these dissenters were compelled to pay tithes and taxes to support government-sponsored churches whose ministers preached inflammatory sermons designed to strengthen and consolidate the established faith by generating a burning hatred against dissenters.

*Id.* at 8–10, 67 S.Ct. at 508–09.

The Religion Clauses are no less valid today. Though it may be argued that state aid to parochial schools is a far cry from the establishment of religion typical of colonial times, the danger nevertheless exists that a law which extends material benefits to citizens along religious lines will greatly increase the risk of religious rancor. Justice Brennan has aptly noted that "government and religion have discrete interests which are mutually best served when each avoids too close a proximity to the other. It is not only the nonbeliever who fears the injection of sectarian doctrines and controversies into the civil polity, but in as high degree it is the devout believer who fears the secularization of a creed which becomes too deeply involved with and dependent upon the government." *Abington School District v. Schempp*, 374 U.S. 203, 259, 83 S.Ct. 1560, 1591, 10 L.Ed.2d 844 (1963). Though separation of church and state is primarily to ensure an independent and neutral political system, it in turn keeps sacred the holy tenets of each individual's personal convictions.

It should be pointed out, however, that the wall of separation between civil and sectarian is not absolute. No one has seriously argued, for instance, that the state should be prohibited from providing churches and other religious institutions with police and fire protection. The state can undoubtedly provide religious institutions with incidental benefits that are afforded to all persons or institutions within a society. *Walz v. Tax Commission*, 397 U.S. 664, 676, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). It is the difficulty in determining whether the benefits are conferred on all members of society that has caused the Supreme Court to draw such perplexing distinctions.

In deciding the constitutionality of the Rhode Island statute at issue in this case, this Court cannot hope to reconcile all the

**1368**

fine distinctions made by the Supreme Court in the area of state aid to parochial schools. Rather, it is this Court's function to analyze the issues now before it, aided by the teachings of the various cases, and render a considered judgment in accord with the principles of the Constitution.

■ The Supreme Court has applied a three-part test in judging the constitutionality of various statutes under the Establishment Clause.[5] *See, e. g., Committee for Public Education v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). First, the statute must have a secular legislative purpose; second, it must have a primary effect that neither advances nor inhibits religion; third, the statute and its administration must avoid excessive government entanglement with religion. Although this three-part test is more difficult to apply than it is to state, it constitutes a convenient and accurate distillation of the Supreme Court's efforts over the years to adjudicate cases under the Establishment Clause and has therefore been recognized as the proper framework of analysis for the issues presented in this case.

Although the plaintiffs have questioned the secular purpose of the challenged deductions, they have failed to introduce any evidence supporting this claim; indeed, they admit that they have raised the argument "only to preserve it for consideration by the United States Supreme Court should the decision of this Court be appealed to it." Without speculating as to the argument the plaintiffs hope to make before the High Court, this Court will, for the purposes of this case, accept the proposition that there is a neutral purpose to the challenged deductions.

The focal point of the plaintiffs' argument is the second prong of the test—the "primary effect." Based on statistics they have submitted demonstrating that the overwhelming percentage of parents eligible for the challenged tuition deductions send their children to sectarian schools, plaintiffs contend that the primary effect of the statute is the advancement of religion.[6]

Plaintiffs also attack the statute on the basis of excessive government entanglement, particularly in its attempt to restrict deductions to expenses actually incurred in the purchase of "secular" textbooks. Plaintiffs submit that there is no meaningful way for the defendant to police the secular text restriction that would not involve the type of excessive entanglement condemned by the Supreme Court in such cases as *Lemon v. Kurtzman,* 403 U.S. 602, 93 S.Ct. 2955, 29 L.Ed.2d 745 (1971).

## II. Primary Effect

Although the Supreme Court has never addressed the specific issue in this case, it has considered the primary effect of a similar tax benefit program in *Committee for Public Education v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973). In *Nyquist,* the Court found unconstitutional a New York statute that provided, *inter alia,* a tuition relief program for parents of children attending elementary or secondary nonpublic schools. The tuition relief consisted of two parts: a direct unrestricted grant of $50 to $100 per child as reimburse-

---

5. Although the plaintiffs have also raised a free exercise claim, the Court hesitates to reach such a novel issue in light of its disposition of the case.

6. Plaintiffs have failed to introduce any statistical evidence concerning the beneficiaries of the transportation and textbook deductions, contending that such deductions are *de minimus* or nonexistent. Because local communities are required under Rhode Island law to provide most public and nonpublic school students with transportation and secular textbooks, R.I.G.L. §§ 16–21–1 (transportation within town limits), 16–21.1–1 *et seq.* (transportation without town limits), 16–23–2 (loan of textbooks), plaintiffs argue that few parents will have such deductible expenses. As a result, they reason that the primary, if not the sole, focus of the Act is tuition itself. To bolster their argument, the plaintiffs have introduced into evidence the fiscal note prepared by the Budget Office of the State of Rhode Island in conjunction with the legislature's consideration of the deductions. This note indicates that no attempt was made to calculate the cost to the state of the deductions for transportation and textbooks. *See* pp. 1373–1374 *infra.*

ment for tuition to all parents whose taxable income was less than $5,000, and a deduction from adjusted gross income for tuition-paying parents whose income was greater than $5,000 but less than $25,000. Unlike the tuition reimbursement portion of the statute, the deduction from gross income was based not upon how much the taxpayer actually paid for nonpublic school tuition, but on the taxpayer's income level. In holding both the tuition reimbursement and the tax relief provisions unconstitutional, the Court noted that 85% of the state's nonpublic schools were church affiliated and concluded that:

> [I]t is precisely the function of New York's law to provide assistance to private schools, the great majority of which are sectarian. By reimbursing parents for a portion of their tuition bill, the State seeks to relieve their financial burdens sufficiently to assure that they continue to have the option to send their children to religion-oriented schools. And while the other purposes for that aid—to perpetuate a pluralistic educational environment and to protect the fiscal integrity of overburdened public schools—are certainly unexceptionable, the effect of the aid is unmistakably to provide desired financial support for nonpublic, sectarian institutions.

*Nyquist, supra,* at 783, 93 S.Ct. at 2971.

The defendant's initial argument is that the plaintiffs have not presented a *prima facie* case as to primary effect. The defendant contends that the plaintiffs' claim should fail because they have done no more than introduce a set of statistics; that is, although the plaintiffs have proved that the overwhelming majority of beneficiaries under the statute send their children to sectarian institutions, they have not shown that religious institutions will receive any benefit.

The Court rejects this contention. It has long been held that a law need not provide

direct financial support to religious institutions themselves in order to have an unconstitutional primary effect. In *Nyquist,* the Supreme Court specifically rejected an argument that the tuition grants and tax deductions should be upheld because they were directed to parents rather than the schools themselves:

> [I]f the grants are offered as incentive to parents to send their children to sectarian schools by making unrestricted cash payments to them, the Establishment Clause is violated whether or not the actual dollars given eventually find their way into the sectarian institutions. Whether the grant is labeled a reimbursement, a reward or a subsidy, its substantive impact is still the same.

*Nyquist, supra,* at 786, 93 S.Ct. at 2972. *See Public Funds For Public Schools of New Jersey v. Byrne, supra,* at 1231.

■ The mere fact that the state has singled out along religious lines a class of its citizens for special economic benefit is sufficient to defeat an otherwise proper disbursement of state funds. *Sloan v. Lemon,* 413 U.S. 825, 832, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973). In striking down a tuition reimbursement program in *Sloan,* the Court emphasized that "this is quite unlike the sort of 'indirect' and 'incidental' benefits that flowed to sectarian schools from programs aiding *all* parents by supplying bus transportation and secular textbooks for their children." *Sloan* at 832, 93 S.Ct. at 2986.[7] Because the Rhode Island statute disproportionately directs its benefits to parents who send their children to religious schools, it cannot be said that the Act merely provides for an "indirect" and "incidental" benefit.

The defendant's second line of argument is to distinguish the challenged deductions from those at issue in *Nyquist.* The *Nyquist* Court noted that while the tax benefit at issue was in the form of a deduction, it operated as a tax credit since the deduc-

---

7. The amici put great emphasis on the fact that the transportation statute upheld in *Everson, supra,* and the textbook statute upheld in *Board of Education v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) conferred a financial benefit on parents and not schools.

Contrary to the amici's implication, these statutes were upheld not because the financial benefit was directed at parents but because they were directed to *all* parents in the community at large.

tions were not based on actual expenditures by the parents. Although the Court refused to decide the case on the basis of the technical label to be applied to the tax benefit, it explicitly reserved decision on the issue of whether "a genuine tax deduction, such as for charitable contributions [would be] constitutionally acceptable under the neutrality test in *Walz v. Tax Commission.*" *Nyquist*, 413 U.S. at 790 n.49, 93 S.Ct. at 2974 n.49. Both the defendant and the amici argue that the deductions authorized by the Rhode Island statute fall within the ambit of the *Nyquist* reservation. They contend that the challenged deductions are more like the property tax exemption upheld in *Walz v. Tax Commission*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) than the tax relief struck down in *Nyquist.*

This Court recognizes that the Rhode Island statute differs from the tax benefit portion of the *Nyquist* statute in two ways. First, it applies to tuition for both public and nonpublic schools. Secondly, the deduction is directly related to the taxpayer's actual educational expenditures. These distinctions are not sufficient, however, to transport the challenged deductions across the constitutional border from *Nyquist* to *Walz.*

In *Walz*, the Supreme Court upheld the New York Tax Commission's grant of a property tax exemption to property used solely for religious purposes. The Court reasoned that the primary effect of the tax exemption was not sponsorship of religion since the government did not transfer part of its revenue to religious institutions, but simply abstained from demanding that the church support the state. Indeed, the Court implied that the exemption of church property from taxation was mandated by the Free Exercise Clause in that it served to minimize involvement and entanglement between church and state. The Court further emphasized that all fifty states have long recognized such an exemption for religious organizations and that the exemption, like police and fire protection, was not limited to religious institutions but was extended to all non-profit educational, charitable, and religious institutions.

The defendant, citing *Minnesota Civil Liberties Union v. Roemer*, 452 F.Supp. 1316 (D.Minn.1978), a federal district court case upholding a tax relief program essentially identical to the one at issue here, argues that the three factors relevant to the constitutionality of the tax exemption in *Walz* are met in this case. Specifically, the defendant argues that (1) the challenged deductions are an abstention from taxation and not a transfer of revenues from state to church; (2) the class of beneficiaries is not restricted to religious institutions; and (3) deductions for charitable contributions have a long history of acceptance.

Defendant's argument that the challenged deductions constitute an abstention from taxation rather than a transfer of revenue from state to church is not persuasive. Defendant correctly points out that the deductions in *Nyquist* were not related to actual educational expenses, as they are here. Because a parent under the *Nyquist* statute could conceivably deduct an amount greater than his or her actual expenses, one might argue that government sponsorship of religious education was greater in *Nyquist* than it is here. Be that as it may, *Nyquist* was not decided on the basis of the disparity between the deduction and the taxpayer's actual expenses. Rather, the *Nyquist* Court stressed that the statute's infirmity lay with the fact that the deductions resulted in a charge upon the state for the purposes of religious education. In concluding that there was little difference between the tuition grant and the tax benefit for purposes of determining whether such aid had the effect of advancing religion, the *Nyquist* Court asserted:

> The qualifying parent under either program receives the same form of encouragement and reward for sending his children to nonpublic schools. The only difference is that one parent receives an actual cash payment while the other is allowed to reduce by an arbitrary amount the sum he would otherwise be obliged to pay over to the State. . . . *'[I]n both instances the money involved represents a charge made upon the state for the purpose of religious education.'*

*Nyquist* 413 U.S. at 791, 93 S.Ct. at 2974–75 (citations omitted) (emphasis added).

This Court fails to see how a tax deduction for actual expenses is any less a charge upon the state. A deduction for actual educational expenses is the economic equivalent of the state helping to provide for those expenses, and as such, it is hardly an abstention from taxation. To argue that the challenged deductions are analogous to the tax exemption upheld in *Walz* is simply a distortion. As the Supreme Court pointed out in *Nyquist,* the *Walz* exemption was not the result "of any purpose to support or to subsidize, but of a fiscal relationship designed to minimize involvement and entanglement between Church and State." *Nyquist* at 793, 93 S.Ct. at 2976.

The defendant's second argument under *Walz* is that the class of beneficiaries is not restricted to religious institutions. It is true that the Rhode Island statute, unlike its counterpart in *Nyquist,* is applicable to parents of public as well as nonpublic school students. An examination of the evidence reveals, however, that this is mere window dressing. Even more so than in *Nyquist,* the overwhelming majority of the taxpayers eligible for the tuition deduction send their children to sectarian schools. This is in stark contrast to the tax exemption upheld in *Walz.* There, the Supreme Court found that the exemption was not restricted in its effect to a class comprised predominantly of religious institutions, but covered all property devoted to educational, charitable, and religious purposes.

Defendant's final argument based on *Walz* is that a tax deduction for charitable contributions, like the property tax exemption in *Walz,* has a long history of acceptance. This may be true, but it is irrelevant.[8] Educational expenses are simply not

charitable contributions. A charitable contribution is one that is given without expecting anything in return; an educational expenditure is a purchase of a service—the payor expects something in return for his money. While deductions for charitable contributions are somewhat analogous to property tax exemptions in that they are available not only for donations to religious institutions, but for donations to most nonprofit organizations, the tuition deduction at issue here is primarily available to parents who send their children to sectarian schools. In the final analysis, I find the challenged tuition deduction indistinguishable from the *Nyquist* deduction and hold that it is not the type of deduction for which there is a long history of acceptance.[9] As the Court pointed out in *Nyquist:*

> [I]t seems clear that tax benefits for parents whose children attend parochial schools are a recent innovation, occasioned by the growing financial plight of such nonpublic institutions and designed, albeit unsuccessfully, to tailor state aid in a manner not incompatible with the recent decisions of this Court.

*Nyquist* at 792, 93 S.Ct. at 2975.

In conclusion, the Court determines that the challenged tuition deduction must fall because it is more analogous to the unconstitutional tax benefit in *Nyquist* than it is to the permitted tax exemption in *Walz.* Given the uncontroverted statistical evidence that over 93% of the children whose parents are eligible for tuition deductions attend sectarian schools, I find that the primary effect of the tuition deduction is the advancement of religion and as such it is unconstitutional under the Establishment Clause.

8. Although the Supreme Court reserved decision on this issue in *Nyquist,* it has never ruled that deductions for charitable contributions are constitutional under the Establishment Clause. This Court need not decide this issue in resolving the instant case.

9. Furthermore, even if tuition deductions did have a long history of acceptance, that would not be enough to make them constitutional. *See Committee for Public Education v. Nyquist,*

413 U.S. 756, 792, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); *Walz v. Tax Commission,* 397 U.S. 664, 678, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). The *Walz* property tax exemptions were upheld not merely because of their long historical acceptance; rather, it was the reason underlying that history of tolerance that proved controlling. *Nyquist,* 413 U.S. at 792, 93 S.Ct. 2955. That reason, a proper balancing of the Free Exercise Clause with the Establishment Clause, does not exist in this case.

Defendant argues that even if the tuition deduction is unconstitutional, the plaintiffs have failed to introduce any evidence concerning the primary effect of the transportation and textbook deductions.[10] Even conceding the plaintiffs' failure to prove an unconstitutional primary effect, the Court finds other reasons for holding the entire statute unconstitutional.

### III. Entanglement

Although the Supreme Court has upheld textbook loan statutes under the Establishment Clause, *see, e. g., Wolman v. Walter,* 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977); *Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); *Board of Education v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), it has never upheld a tax deduction for textbook expenses. I believe that the tax deduction is constitutionally distinct from the loan cases in its potential for excessive entanglement between church and state.

■ The statutes at issue in *Allen* and its progeny authorized local school boards to purchase secular textbooks with public funds and lend them to both public and nonpublic school students. At the very least, then, these cases stand for the proposition that it is not unconstitutional *per se* for the state to provide secular textbooks for parochial school children. But this does not mean that the state can provide such aid in any manner it chooses. In each of the statutes upheld by the Supreme Court, government involvement with religion was at a minimum; once the state made an initial inspection of the books to ensure that they were secular, its responsibility was at an end. In *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Supreme Court contrasted the minimal government involvement implicit in the textbook loan statutes with a state program to supplement salaries of teachers of secular subjects:

A comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed and the First Amendment otherwise respected. Unlike a book, a teacher cannot be inspected once so as to determine the extent and intent of his or her personal beliefs and subjective acceptance of the limitations imposed by the First Amendment. These prophylactic contacts will involve excessive and enduring entanglement between state and church.

*Lemon v. Kurtzman* at 619, 91 S.Ct. at 2114.

Like the program ruled unconstitutional in *Lemon,* the deduction for textbooks would require a comprehensive and continuing surveillance to enforce the restriction against religious oriented books, since under the statute parents decide for themselves which books are secular. The fact that the statute includes "other instructional materials and equipment" in addition to books makes the likelihood of entanglement even greater, according to recent Supreme Court decisions, because the government would not only have to supervise the parents' purchases, but it would have to supervise the parochial schools themselves to ensure that the "instructional materials" were not to be used in the course of religious instruction. *See Wolman v. Walter,* 433 U.S. 229, 248–251, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977) (statute authorizing state purchase and loan to pupils of instructional materials and equipment such as projectors, tape recorders, maps, science kits and the like held unconstitutional); *Meek v. Pittenger,* 421 U.S. 349, 362–66, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975) (statute authorizing state to loan pupils periodicals, maps, recordings, projectors, laboratory paraphernalia and the like held unconstitutional).

■ Because the deduction for secular textbooks and other instructional materials cannot be policed without excessive government entanglement, the textbook deduction is unconstitutional under the Establishment Clause.

### IV. Severability

■ As to the transportation deduction, the Court does not believe that the govern-

---

**10.** For the plaintiffs' response to this argument, see n.6 *supra.*

ment's administration of the deduction would involve excessive entanglement, nor does it find an illegal primary effect, the plaintiffs having presented no evidence on this issue. Given this determination, the defendant argues that the Court should leave the transportation deduction standing even as it strikes down the deductions for tuition and textbooks. I disagree.

■ Although the Rhode Island Income Tax Act contains a severability clause [11] that is generally applicable to all provisions in the Act, the presence of such a clause—particularly one that is of general rather than narrow applicability—is not conclusive on the question of severability. *United States v. Jackson,* 390 U.S. 570, 585 n.27, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968). Rather, the determining factor is the intent of the legislature: whether the legislature would have enacted the constitutional portion of the statute independently of the unconstitutional provisions. *See Champlin Refining Co. v. Corporation Commission,* 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062 (1932).

In the instant case, the major focus of the legislature in passing R.I.G.L. § 44–30–12(c)(2) was the tuition deduction. Having

previously provided for publicly funded transportation [12] and the loan of text-books,[13] the legislature undoubtedly realized that the major portion of parents' educational expenses was tuition.[14] The fiscal note prepared by the Budget Office supports this conclusion. That note, which is prepared by the Budget Office pursuant to R.I.G.L. § 22–12–1's mandate to estimate the effect of all bills and resolutions on the revenues, expenditures or fiscal liability of the state, indicates that no attempt was even made to calculate the cost to the state of the deductions for transportation and textbooks. Indeed, a spokesperson for the Budget Office acknowledged that in preparing the fiscal note, the Budget Office operated under an assumption that the major impact of the challenged deductions would come from tuition. Plaintiffs' Exhibit A.

In *Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), the Court was faced with a similar issue of severability. In *Meek,* the Court ruled unconstitutional a gamut of state funded educational services and equipment including testing services, psychological services, maps, re-

11. R.I.G.L. § 44–30–96 reads as follows:
*Severability of provisions.*—If any provision of this chapter or the application thereof shall for any reason be judged invalid, such a judgment shall not affect, impair or invalidate the remainder of the law, but shall be confined in its effect to the provision or application directly involved in the controversy giving rise to the judgment.

12. R.I.G.L. § 16–21–1 requires that the school committee of any town provide suitable transportation to and from schools for pupils attending public and private schools of elementary and high school grades.
R.I.G.L. § 16–21.1–1 *et seq.* provides for transportation of school pupils beyond city and town limits to regional, consolidated and special education schools.

13. R.I.G.L. § 16–23–2 requires the local school committee to loan textbooks in the fields of mathematics, science and modern foreign languages, which appear on a list of textbooks published by the commissioner of education, to all private and public elementary and secondary school students who reside in such community. In addition, the statute requires local school committees to furnish, free of charge, all

other textbooks and school supplies to pupils of public schools.
This statute, under which textbooks may be lent for use in sectarian schools, has been upheld by the Rhode Island Supreme Court as constitutional under the Establishment Clauses of both the Constitution of Rhode Island and the United States Constitution. *Bowerman v. O'Connor,* 104 R.I. 519, 247 A.2d 82 (1968).

14. R.I.G.L. § 16–21.1–1 *et seq.,* which provides for transportation outside town limits to regional schools, is currently under constitutional attack before this Court in *Members of the Jamestown School Committee v. Schmidt,* C.A. No. 77–0511. If the statute is held unconstitutional under the Establishment Clause, the result may very well be that parents who send their children to regional schools will have to pay for transportation themselves and will thereby be eligible for the transportation deduction under R.I.G.L. § 44–30–12(c)(2). In that event, the deduction for transportation costs would become a more significant portion of the statute. It should be noted, however, that if the great majority of these regional schools are sectarian, then the transportation deduction itself would be susceptible to constitutional attack under the primary effect test.

**1374**

cordings, and photographs. In addition to these unconstitutional provisions, the statute included certain diagnostic services such as speech and hearing services that the Court believed fell within that class of general welfare services that may be provided by the state. Although the statute contained a severability clause, the Court declared that in view of the fact that the diagnostic services constituted a minor portion of the services authorized by the Act, it could not assume that the Pennsylvania General Assembly would have passed the law solely to provide such aid. *See also Sloan v. Lemon,* 413 U.S. at 833–34, 93 S.Ct. 2982.

In light of my determination that the transportation deduction constitutes a minor portion of R.I.G.L. § 44–30–12(c)(2), the Court refuses to sever the statute. The entire statute is thus declared unconstitutional under the Establishment Clause.

### V. Conclusion

Whenever this Court is called upon to review a statute providing for aid to religious schools, it is aware of the great service such schools have provided the community over the years. The Court is also aware that increasing costs and declining enrollment have made it more and more difficult for such schools to continue to provide this service. Despite these sympathies, this Court's responsibility is not to respond to public sentiment, but to uphold the Constitution of the United States. Although the tax savings authorized by R.I.G.L. § 44–30–12(c)(2) are perhaps negligible (an average savings of thirty-three dollars per household), the statute is clearly contrary to the Establishment Clause of the First Amendment to the Constitution. For the reasons set out above, the Court declares the statute unconstitutional and permanently enjoins the defendant Tax Administrator of the State of Rhode Island from taking steps to prepare or print forms and instructions for income tax returns that incorporate, refer or relate to the challenged deductions contained in the Act, and from permitting any taxpayer to claim such deductions on his or her tax return.