Lisa BENDER, et al., Plaintiffs,

v.

The WILLIAMSPORT AREA SCHOOL
DISTRICT, et al., Defendants.

Civ. No. 82–0692.

United States District Court,
M.D. Pennsylvania.

May 12, 1983.

Gerald Seevers, Williamsport, Pa., Samuel Ericson, Kimberly Colby, Curran Tiffany, Springfield, Va., for plaintiffs.

Nathan Stuart and David Bahl, Williamsport, Pa., for defendants.

## OPINION AND ORDER

NEALON, Chief Judge.

This case involves an interesting, yet difficult and volatile area of constitutional law. The Williamsport Area School District has adopted a policy establishing a regularly-scheduled activity period to encourage students to organize clubs and groups and hold meetings at its high school. The plaintiffs herein requested permission to form a club which would use the period to read scriptures, pray, discuss religious questions and engage in "other activities . . . of interest to the group." The request was denied. No student group or organization previously has been denied the opportunity to participate in the activity period. The specific question for resolution then, is whether *under the precise facts presented,* this wholly student-initiated prayer club may meet during the activity period.

At the outset, it is necessary to emphasize what this case does *not* involve lest there be a mistake about the scope of the court's holding. This is not a case where school administrators have adopted a rule or policy requiring, or even allowing, students to meet for religious purposes. This is not a case where a school teacher or other school official has adopted a practice of requiring or encouraging school prayer or other religious discussion in his classroom. It is not a case where a teacher or other school official encouraged or counselled the students to request the opportunity to meet during the

activity period. It is not a case where the students represent a particular religious denomination. Rather, in this case, a number of students, acting voluntarily and free of outside influences, have requested permission to form a club and meet during the school's activity period on the same basis as other student organizations. The request was denied on the sole ground that the students wish to engage in religious speech. This decision was not based upon a judgment regarding curricular choices or concerns of discipline and order. It was based solely upon the belief that the school board cannot exercise power to grant the request without contravening the United States Constitution.

The case implicates a constitutional conflict of the highest order. The plaintiffs assert a constitutional right as the basis of their claim. The defendants assert a constitutional limitation as the basis of their defense. The students argue that the "First Amendment" requires the school to grant them the permission they seek. The school district argues that the "First Amendment" bars it from granting such permission.

The First Amendment concerns implicated in this case are embodied in three discrete clauses of that constitutional provision. The plaintiffs invoke the Free Speech and Free Exercise clauses to support the proposition that they have a "right to pray" under the facts of this case. The defendants raise the Establishment Clause as a defense, arguing that it stands as a constitutional bar to the relief sought. Many courts have recognized that there is a certain amount of "tension" between the two religion clauses of the Constitution. *See, e.g., Thomas v. Review Board of the Indiana Employment Security Division,* 450 U.S. 707, 719, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981). At least part of the

blame for this inconsistency has been placed upon an "overly expansive interpretation" of these provisions. *Id.* at 721, 101 S.Ct. at 1433 (Rehnquist, J., dissenting).[1] It appears that the strongest criticism has been reserved for the Supreme Court's liberal construction of the Establishment Clause, which relies, *inter alia,* upon the metaphor of an unyielding wall erected to separate church and state. *See, e.g., Public Funds for Public Schools of New Jersey v. Byrne,* 590 F.2d 514, 522 (3d Cir.) (Weis, J., concurring), *aff'd,* 442 U.S. 907, 99 S.Ct. 2818, 61 L.Ed.2d 273 (1979).[2] In addition, Establishment Clause cases have been criticized because they fail to provide "a principled and logical thread" for the resolution of future cases. 590 F.2d at 521 (Weis, J., concurring).

There may be merit to these arguments. Nevertheless, this court is bound by, and must work with, the guidance given to it by appellate decisions. While the precedents in this area are not the easiest to reconcile and to apply to given facts, they are precedents nonetheless, and will be treated accordingly. This court has neither the power nor the inclination to depart from binding authorities whether it be by express statement or by a holding which fails to conform to prior cases in a logical and objective fashion. Knowing of the strongly held views on this subject, I venture into the thicket with some apprehension.

Presently before the court are the parties' cross-motions for summary judgment. While there appears to be a factual dispute between the parties, it is not of sufficient importance to preclude the entry of summary judgment. *See* note 4 *infra.* Indeed, the parties agree that no genuine issue of *material* fact remains. Although the case presents only a question of law, this is not to say that the facts are unimportant. On the contrary, the undisputed facts are of

1. *See, also* President's Message to Congress, May 17, 1982, H.Doc. No. 97–180, *reprinted in* [1982] U.S.Code Cong. & Ad.News D45, D45–46 (proposing "voluntary prayer" amendment to Constitution).

2. "So often a wall implies fear and hostility, as the infamous structure separating East and West Berlin so dramatically demonstrates. No

such emotions should dominate the relationship between government and religion and the use of a metaphor that encourages such concepts is not desirable." *Public Funds for Public Schools of New Jersey v. Byrne,* 590 F.2d 514, 522 (3d Cir.) (Weis, J., concurring), *aff'd,* 442 U.S. 907, 99 S.Ct. 2818, 61 L.Ed.2d 273 (1979).

paramount importance to the resolution of the legal question presented in this case. A slight change in the facts could very well have dictated a contrary decision.

After carefully reviewing those facts, and after giving full consideration to all pertinent legal authority, the court concludes that because the defendant school district is not constitutionally required to deny the plaintiffs the opportunity to meet, by doing so solely on constitutional grounds it has impermissibly burdened their free-speech rights. Accordingly, summary judgment will be granted in favor of the plaintiffs. The discussion set forth below outlines the reasons for this decision.

## FACTS

The events which led to the filing of this action began in September, 1981 when sev-

eral of the plaintiffs,[3] including Lisa Bender, Morris Braggs and Kerri Hunter, met with Wayne Newton, Principal of the Williamsport Area High School and a defendant herein. The students requested permission to form a club[4] which would meet during the school's activity period.[5] Permission was granted and the club met during the first activity period thereafter with approximately forty-five students and a teacher acting as monitor in attendance.

After the initial meeting of the club, Mr. Newton informed the students that they could not meet further until he discussed the matter with Dr. Oscar Knade, Superintendent of the Williamsport Area School District. On October 1, 1981, the students sent a letter to Dr. Knade concerning their desire to form a voluntary nondenomina-

---

**3.** Six of the plaintiffs, *viz.,* Lisa Bender, Morris Braggs, Tony Robb, Robin Kriner, Kerri Hunter and Brenda Kay Herzog, have been graduated from the Williamsport Area High School since this action was instituted and, therefore, no longer have standing to seek injunctive relief. This action remains "a case or controversy," however, as four of the plaintiffs are still students at the high school.

**4.** A review of the record in this case reveals a conflict in the testimony on whether Mr. Newton knew the purpose of the proposed club when he first granted permission for it to meet. The affidavit of Lisa Bender states:

[W]e requested permission to form a club to hold meetings during the regularly scheduled activity period, at which time there would be prayer and Bible reading. Mr. Newton told us to go ahead and meet because other students had done so in previous years and he did not believe that there would be any problems. He did, however, inform us that we could not advertise our meetings either by announcing or by posting announcements on bulletin boards.

Affidavit of Lisa Bender, Document 15 of the Record, at pp. 1–2.

In contrast, Mr. Newton testified at his deposition as follows:

Their original request was not very clear to me. Originally, they were saying that they wanted to meet as a group of students and my question to them was for what purpose and they more or less left me with the belief that they had to meet as a group before they could give me their purpose. I did permit, more or less, an organizational-type meeting for these students to meet so they could tell me what they were going to do. When they

made known to me what they were going to do, at that point I had to, in my opinion, say no at that point because of the literature I have read with regard to prior-type groups meeting on school time.

Deposition of Wayne A. Newton, Document 16 of the Record, at p. 18.

While it is true that a court may not resolve disputed factual issues on a motion for summary judgment, the factual dispute outlined above does not prevent summary judgment in this case because it is not material to the reasoning employed by the court.

**5.** The activity period is a regularly scheduled part of the school day which occurs between 7:57 a.m. and 8:27 a.m., usually on Tuesday and Thursday of each week. During this period various club meetings and activities take place. Affidavit of Wayne E. Newton, Document 21 of the Record at 2–3. According to Mr. Newton: "Activities and clubs which promote the intellectual, physical and social development of students have been approved as officially sanctioned student activities, permitted to meet during the school day, *i.e.,* the activity period, permitted to use school facilities and with a faculty advisor or monitor assigned to it." *Id.* at 3. *See also* discussion *infra.* Each student club is given use of a bulletin board which may be used for announcements and displays. Additionally, clubs are granted access to the school's public address system. There is no requirement that either the bulletin board or the public address system must be used. The school has an unwritten policy requiring an advisor for each club. *See* Document 25 of the Record.

tional group "to read some scriptures and pray to God that he might edify [their] minds." By letter dated October 21, Dr. Knade requested further information on the proposed activity and told the students that he would discuss the matter with them after he received a legal opinion from the School District's Solicitor on the propriety of such an activity on school premises. Thereafter, the students sent the following "Proposal For a New Student Organization" to Dr. Knade:

NAME OF THE ORGANIZATION

Petros (The Rock)

NATURE OF THE ORGANIZATION

The Organization will be a nondenominational prayer fellowship.

Participation will be voluntary and open to all students.

PURPOSE OF THE ORGANIZATION

The purpose of the organization will be to promote spiritual growth and positive attitudes in the lives of its members.

LEADERSHIP

Selection of leaders will be by democratic election. The leaders will be responsible for directing the meetings and co-ordinating activities in a manner that will carry out the purpose of the organization.

MEETINGS

Regular meetings of the organization will be held on school premises during the Tuesday and Thursday morning activity periods. They will include scripture reading, discussion, prayer and other activities which may be of interest to the group.

SUPERVISION

Meetings of the organization will be supervised by a faculty advisor. Student attendance may be verified by the signing of a roster.

Exhibit 3 to Document 8 of the Record.

On November 16, 1981, Mr. Newton and Dr. Knade met with representatives of the proposed group. The students were told that, based on the Solicitor's legal opinion, their request must be denied. Dr. Knade and Mr. Newton then discussed with the students an alternative whereby the club could meet off school property. The defendants indicated that if the students secured a location and an adult supervisor, preferably a clergyman, they would be given released time during the activity period. The students said they would explore this alternative.

Thereafter, the students sent a letter to the Chairman of the Williamsport Area School Board appealing the Superintendent's decision to deny them recognition and requesting approval of their club by the School Board. At a meeting held January 19, 1982, the Board affirmed the Superintendent's action and denied the appeal on the basis of the Solicitor's opinion. *See* Exhibit 5 to Document 15 of the Record. The students were notified of the Board's decision by letter dated January 21, 1982.

The students subsequently instituted this action alleging that the defendants' refusal to recognize "Petros" and allow it to meet on the same basis as other student groups solely because of its religious nature violated their civil rights. Specifically, plaintiffs claim that the defendants' action constitutes violations of the Freedom of Speech, Freedom of Religion and Establishment Clauses of the First Amendment, as well as the Equal Protection Clause of the Fourteenth Amendment. The defendants' answer to these claims is that their actions were proper inasmuch as to allow a group such as "Petros" to meet on public school premises would violate the First Amendment's Establishment Clause.

### FREE EXERCISE

■ The First Amendment's Free Exercise Clause proscribes governmental regulation of religious beliefs. *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). This proscription reaches both the compulsion of a certain belief, *Torcaso v. Watkins,* 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961), and the imposition of a penalty for a belief, *Fowler v. Rhode Island,* 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953). *See Sherbert v. Verner,*

374 U.S. 398, 402, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963). Plaintiffs herein argue that by denying them the opportunity to meet on the same basis as other student groups, the School District has penalized them for their religious belief and, thus, run afoul of the Free Exercise Clause.

■ A free exercise claim involves a two-tiered analysis. First, the individual must show that the state has either "condition[ed] receipt of an important benefit upon conduct proscribed by a religious faith" or "deni[ed] such a benefit because of conduct mandated by religious belief," *Thomas v. Review Board of the Indiana Employment Security Division,* 450 U.S. 707, 717–18, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981). *See McDaniel v. Paty,* 435 U.S. 618, 626, 98 S.Ct. 1322, 1327, 55 L.Ed.2d 593 (1978); *School District of Abington Township v. Schempp,* 374 U.S. 203, 223, 83 S.Ct. 1560, 1572, 10 L.Ed.2d 844 (1963); *Sherbert v. Verner,* 374 U.S. at 403–04, 83 S.Ct. at 1793–94.[6] Once the coercive effect of the state's action is shown, that action will pass constitutional muster only if the state can demonstrate a compelling interest and that less restrictive means are not available to serve that interest. *Wisconsin v. Yoder,* 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972); *Sherbert v. Verner,* 374 U.S. at 407–09, 83 S.Ct. at 1795–96.

In *McDaniel v. Paty,* 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978), the Supreme Court struck down a Tennessee statute barring ministers or priests from serving as delegates to the State's constitutional convention as violative of the Free Exercise Clause. Writing for the plurality, Chief Justice Burger reasoned that the Free Exercise Clause "encompasses the right to preach, proselyte and perform other similar religious functions," *id.* at 626, 98 S.Ct. at 1327, and that Tennessee law acknowledged "the right of its adult citizens generally to seek and hold office as legislators or dele-

gates to the state constitutional convention." *Id.* However,

> under the clergy-disqualification provision, McDaniel cannot exercise both rights simultaneously because the state has conditioned the exercise of one on the surrender of the other. Or, in James Madison's words, the State is 'punishing a religious profession with the privation of a civil right. . . .' In so doing, Tennessee has encroached upon McDaniel's right to the free exercise of religion. 'To condition the availability of benefits including access to the ballot upon this appellant's willingness to violate a cardinal principle of his religious faith by surrendering his religiously impelled ministry effectively penalizes the free exercise of his constitutional liberties.'

*Id.* (citations omitted). *Cf. Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (compulsory education law requiring attendance through age sixteen violated free exercise rights of Amish whose religion requires its members to minimize contact with world influences by discontinuing formal education after eighth grade).

Similarly, in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), the Supreme Court held unconstitutional South Carolina's denial of unemployment compensation benefits to a Seventh Day Adventist because of her religious objection to Saturday work. The ineligibility for benefits "force[d] her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship." *Id.* at 404, 83 S.Ct. at 1794. *See Thomas v. Re-*

---

**6.** In analyzing the coercive effect of the state's enactment on the practice of religion, the court does not determine the sincerity of a religious belief. Rather, the court should "inquire into the relative importance of a particular religious ritual and the degree to which exercise of that

practice is infringed by government action." *Brandon v. Board of Education of the Guilderland Central School District,* 635 F.2d 971, 976 (2d Cir.1980), *cert. denied,* 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981).

view Board of Indiana Employment Security Division, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) (denial of unemployment compensation to claimant who terminated his job because his religious belief forbade participation in production of armaments violated free exercise clause).

■ In each of the above cases, the individuals were forced to either neglect their religious beliefs or forfeit a state benefit. No such situation exists in the present case. "While school attendance is compelled for several hours per day, five days per week, the students, presumably living at home, are free to worship together as they please before and after the school day and on weekends in a church or any other suitable place." Brandon v. Board of Education, supra, 635 F.2d at 977 (citing Stein v. Oshinsky, 348 F.2d 999, 1001 (2d Cir.), cert. denied, 382 U.S. 957, 86 S.Ct. 435, 15 L.Ed.2d 361 (1965); School District of Abington Township v. Schempp, 374 U.S. 203, 299, 83 S.Ct. 1560, 1612, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring)); see Pinsker v. Joint District No. 28J, 554 F.Supp. 1049 (D.Colo.1983); cf. Chess v. Widmar, 635 F.2d 1310, 1320 (8th Cir.1980) (prayer at public university must be allowed because students both study and live there and may be unable to hold meetings off campus), aff'd sub nom., Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). See generally School District of Abington Township v. Schempp, supra, 374 U.S. at 296–97, 83 S.Ct. at 1610–11 (Brennan, J., concurring) (free exercise rights would be abrogated if religious activity on military base or prison were prohibited).

Inasmuch as the school district's refusal to let the plaintiffs meet during the activity period does not force them to forego their religious belief in group worship, the plaintiffs' free exercise rights have not been violated. Accord, Brandon v. Board of Education, supra, 635 F.2d at 977–78; Johnson v. Huntington Beach Union High School District, 68 Cal.App.3d 1, 137 Cal.Rptr. 43, cert. denied, 434 U.S. 877, 98 S.Ct. 228, 54 L.Ed.2d 156 (1977); cf. Pinsker v. Joint

District No. 28J, supra, 554 F.Supp. at 1051–52. Moreover, the court would note that to the extent, if any, the plaintiffs' belief in group worship should have been accommodated by the school district, the school's offer to allow the students to meet off school grounds during the activities period represents an attempt at such accommodation.[7] Cf. Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952).

## FREE SPEECH

■ Local school boards have broad discretion in the management of school affairs. See, e.g., Meyer v. Nebraska, 262 U.S. 390, 402, 43 S.Ct. 625, 627, 67 L.Ed. 1042 (1923); Pierce v. Society of Sisters, 268 U.S. 510, 534, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925). It is clear, however, that this discretion "must be exercised in a manner that comports with the transcendent imperatives of the First Amendment." Board of Education, Island Trees Union Free School District v. Pico, —— U.S. ——, 102 S.Ct. 2799, 2806, 73 L.Ed.2d 435 (1982); see Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968); West Virginia v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). As the Supreme Court has recently reiterated: "Boards of Education ... have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual...." Board of Education, Island Trees Union Free School District v. Pico, supra, 102 S.Ct. at 2807 (quoting West Virginia v. Barnette, 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943)). Thus, students do not "shed their rights to freedom of speech or expression at the schoolhouse gate." Tinker v. Des Moines School District, supra, 393 U.S. at 506, 89 S.Ct. at 736. "They are possessed of funda-

7. The record does not indicate why the plaintiffs rejected this offer.

mental rights which the state must respect. . . . In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views." *Id.* at 511, 89 S.Ct. at 739. In the instant case, the court must determine whether these students' First Amendment right to freedom of speech, applied "in light of the special characteristics of the school environment," *id.* at 506, 89 S.Ct. at 736, has been abridged by the school district's denial of recognition to Petros and refusal to allow it to meet on the same basis as other groups.

The plaintiffs argue that the Williamsport Area High School's activity period is a "public forum" created by the school. When the government seeks to restrict expression in such a forum, it bears the heavy burden of demonstrating that the "regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Widmar v. Vincent,* 454 U.S. at 270, 102 S.Ct. at 274; *see, e.g., City of Madison Joint School District No. 8 v. Wisconsin Employment Relations Commission,* 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976); *Police Department of the City of Chicago v. Mosley,* 408 U.S. 92, 98–99, 92 S.Ct. 2286, 2291–92, 33 L.Ed.2d 212 (1972). *See generally Grayned v. City of Rockford,* 408 U.S. 104, 115–19, 92 S.Ct. 2294, 2302–05, 33 L.Ed.2d 222 (1972). The plaintiffs maintain that the exclusion of religious discussion from the "public" activities hour constitutes content-based discrimination which can be justified only by a compelling state interest. The defendants counter that the school is not a public forum and, therefore, they have the power to exclude discussion of a particular subject.[8]

It is axiomatic that the First Amendment's guarantee of free speech denies government the power "to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Department of the City of Chicago v. Mosley,* 408 U.S. at 95–96, 92 S.Ct. at 2289–90. Accordingly, the prohibition against content-based discrimination applies whether the "forum" can be denominated as "public," *see, e.g., id.; Widmar v. Vincent,* 454 U.S. at 269–70, 102 S.Ct. at 273–74, or "non-public," *United States Postal Service v. Council of Greenburgh Civic Ass'ns,* 453 U.S. 114, 131 n. 7, 101 S.Ct. 2676, 2686 n. 7, 69 L.Ed.2d 517 (1981); *Greer v. Spock,* 424 U.S. 828, 840, 96 S.Ct. 1211, 1218, 47 L.Ed.2d 505 (1976). When a "non-public" forum is involved, however, the content-neutrality test may be satisfied if there is no discrimination among viewpoints on a given subject even though there is discrimination against a particular subject. *See, e.g., Perry Educ. Ass'n v. Perry Local Educ. Ass'n,* —— U.S. ——, 103 S.Ct. 948, 957, 74 L.Ed.2d 794 (1983); *Greer v. Spock,* 424 U.S. at 838 & n. 10, 96 S.Ct. at 1217 & n. 10; L. Tribe, American Constitutional Law § 12–21 at 691 n. 12; *see also Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974). Absent a compelling state interest, the government has no right to predicate access to a "public" forum upon the subject matter of the speech or the status of the speaker. *Perry Educ. Ass'n v. Perry Local Educ. Ass'n,* 103 S.Ct. at 957.

A central principle of this doctrine is that a given parcel of government property will not be considered a true public forum "where the full exercise of First Amendment rights would be inconsistent

---

**8.** It is now settled that religious speech is entitled to constitutional protection. *See Widmar v. Vincent,* 454 U.S. at 269, 102 S.Ct. at 273. As recently stated by Justice Brennan:

> That public debate of religious ideas, like any other, may arouse emotion, may incite, may foment religious divisiveness and strife does not rob it of constitutional protection . . . . The mere fact that a purpose of the Establishment Clause is to reduce or eliminate religious divisiveness or strife does not place religious discussion, association or political

> participation in a status less preferred than rights of discussion, association, and political participation generally.

*McDaniel v. Paty,* 435 U.S. 618, 640, 98 S.Ct. 1322, 1335, 55 L.Ed.2d 593 (Brennan, J., concurring) (citations omitted).

Moreover, any argument that religious worship and prayer, as distinguished from discussions about religious matters, is not speech protected by the First Amendment must fail. *Widmar v. Vincent,* 454 U.S. at 269 n. 6, 102 S.Ct. at 274 n. 6.

with 'the special interests of a government in overseeing the use of its property.'" *International Soc'y for Krishna Consciousness v. New Jersey Sports and Exposition Authority,* 691 F.2d 155, 160 (3d Cir.1982) (citation omitted); *see, e.g., United States Postal Service v. Council of Greenburg Civic Ass'ns,* 453 U.S. at 128–32, 101 S.Ct. at 2684–86 (mailbox not a public forum); *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 130, 97 S.Ct. 2532, 2540, 53 L.Ed.2d 629 (1977) (prison not a public forum); *Grayned v. City of Rockford,* 408 U.S. at 116, 92 S.Ct. at 2303 (public library not a public forum as to loud behavior); *Brown v. Louisiana,* 383 U.S. 131, 139, 86 S.Ct. 719, 722, 15 L.Ed.2d 637 (1966) (public library is a public forum as to silent vigil); *American Future Systems, Inc. v. Pennsylvania State University,* 618 F.2d 252, 256–57 (3d Cir.1980) (university dormitory not a public forum as to commercial sales meetings). Thus, it is clear that the mere fact that the government owns a piece of property is not dispositive of the question whether the property is a "forum" for public use. *United States Postal Service v. Greenburgh Civic Ass'ns,* 453 U.S. at 129, 101 S.Ct. at 2684. "The primary factor in determining whether [the] property . . . is a public forum is how the locale is used." *International Soc'y for Krishna Consciousness v. New Jersey Sports and Exposition Authority,* 691 F.2d at 160; *see Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 650–51, 101 S.Ct. 2559, 2565–66, 69 L.Ed.2d 298 (1981); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 555, 95 S.Ct. 1239, 1244, 43 L.Ed.2d 448 (1975); *Grayned v. City of Rockford,* 408 U.S. at 116, 92 S.Ct. at 2303. Places which traditionally have been dedicated to public assembly and debate are considered public forums. The classic examples are streets, parks and sidewalks. *See, e.g., Hague v. C.I.O.,* 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939).

■ A third category of public property is the "limited" public forum. Not being traditionally used as a forum for the public, the "limited" public forum gains its status from the government's decision to allow the property to be used for expressive activity. *See, e.g., Perry Educ. Ass'n v. Perry Local Educ. Ass'n,* 103 S.Ct. at 955; *Widmar v. Vincent,* 454 U.S. at 267 & n. 5, 102 S.Ct. at 273 & n. 5. The government generally will be permitted to impose restrictions on the use of a limited forum if they are necessitated by the purpose for which the forum was created. Indeed, the scope of permissible limitations appears to be defined by the government's purpose in creating the forum. By the same token, however, the government will be required to satisfy the elements of "compelling state interest" scrutiny if the limitations placed upon the use of the forum are not necessitated by the nature and purpose of the forum.

For example, a university which accommodates student organizations by making its facilities "generally open" for their meetings will have created a "limited" public forum. The forum is limited by the nature and purpose of the university's action. Therefore, the university need not fear that its decision will throw its doors open for use by the general public. *See, e.g., Widmar v. Vincent,* 454 U.S. at 267–68 n. 5, 102 S.Ct. at 272–73 n. 5; *cf. American Future Systems, Inc. v. Pennsylvania State University,* 618 F.2d at 256–57 (university opening dormitories for use by students need not allow corporation to hold sales meetings with students). It is clear that the nature of the forum is such that "outsiders" may be excluded without violating their First Amendment rights. The university, however, may not preclude students from discussing certain topics at their meetings in the forum. While the nature of the forum necessarily requires exclusion of "outsiders," it does not require that "insiders" confine their discussions to university-approved topics. In this type of "limited" forum, then, a content-based restriction of certain subject matter must be narrowly drawn and further a compelling state interest. *See Widmar v. Vincent,* 454 U.S. at 270, 102 S.Ct. at 274. *See also Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975).

A converse yet analogous situation is presented in the case of government bodies which hold "public meetings" in order to gain input from citizens on a given issue. Unlike the university situation, the forum may be limited as to subject matter but not as to the status of the participants. Having created a forum for the general public to discuss a given topic, the government may very well limit or even prohibit discussion of impertinent matters. *See, e.g., City of Madison Joint School District No. 8 v. Wisconsin Employment Relations Commission,* 429 U.S. at 175 n. 8, 97 S.Ct. at 426 n. 8. Absent compelling justifications, however, the government may not confine the participants in the discussion to "one category of interested individuals." *Id.* at 175, 97 S.Ct. at 426. While irrelevant topics may be excluded during such a public meeting, the nature of the forum is such that individuals may not be barred from the discussion without a substantial justification.[9]

The plaintiffs argue that the Williamsport Area High School has created a limited public forum as did the university in the situation described above. *See Widmar v. Vincent,* 454 U.S. at 263, 102 S.Ct. at 269, 70 L.Ed.2d 440. The court agrees that the high school's decision to create an activity hour to promote and stimulate student group participation is factually similar to the situation in *Widmar.* It is undisputed that the activity period is "generally open for use by student groups." *See generally Widmar v. Vincent,* 454 U.S. at 267, 102 S.Ct. at 272. At the present time, more than twenty-five student organizations benefit from this forum. *See* Document 21 of the Record at 3–4; Document 22 of the Record at 3. These include a newspaper, a literary magazine, a speech and drama club and student governments. Perhaps more importantly, it is undisputed that the high

school has *never* deprived any other proposed group from benefiting from the activity period. Finally, the principal stated that he would grant this benefit to any student organization deemed to be "a legal and proper" one. These factors demonstrate that the high school has adopted a policy of "equal access" to student groups. Accordingly, since there is no evidence supporting a contrary conclusion, the court must find that this activity period is "generally open for use by student groups" within the meaning of the *Widmar* case. *Cf. International Soc'y For Krishna Consciousness v. New Jersey Sports and Exposition Authority,* 691 F.2d at 160 ("since the exchange of ideas is an essential part of the educational process but the need for discipline and order is great, a public high school is probably a limited forum). This being a "limited" forum, in the sense that its use is "limited" to student groups, a content-based decision to exclude subject matter would require compelling state interest scrutiny.[10]

Notwithstanding that *Widmar* appears to control under these facts, the court feels that some discussion of the unique nature of a high school must be undertaken before deciding that the compelling state interest test must apply here. Indeed, the *Widmar* Court emphasized that "First Amendment rights must be analyzed 'in light of the special characteristics of the school environment.'" 454 U.S. at 267–68 n. 5, 102 S.Ct. at 272–73 n. 5 (quoting *Tinker v. Des Moines Independent School District,* 393 U.S. at 506, 89 S.Ct. at 736). It takes no great insight to realize that a high school possesses "special characteristics" not present in a college environment. Thus, it is clear that there may be some instances in which a high school forum does not give rise

---

**9.** Defendants do not argue that the activity period is designed to promote the discussion of a certain subject matter. *See generally City of Madison Joint School District No. 8 v. Wisconsin Public Employment Relations Commission,* 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976). Moreover, there is no contention that Petros would fail to satisfy one or more of the objectives which student clubs are designed to

promote, *i.e.,* "the intellectual, physical and social development of students," *see* Document 21 of the Record at 3.

**10.** Although not raised by the parties, the court would note that by denying Petros recognition, the defendants engaged in a form of prior restraint. *See Healy v. James,* 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972).

to the same right of expression as does a university forum.

The First Amendment rights of high school students "are not coextensive with those of adults and may be modified or curtailed by school policies that are reasonably designed to adjust those rights to the needs of the school environment." *Nicholson v. Board of Education Torrance Unified School District,* 682 F.2d 858, 863 (9th Cir. 1982); *accord, Williams v. Spencer,* 622 F.2d 1200, 1205 (4th Cir.1980). One such need involves order and discipline. Despite the fact that a limited forum is involved, it would seem clear that a school administrator legitimately may decide to exclude an activity if it would interfere "with the school['s] work or ... the rights of other students to be secure and to be left alone." *See Tinker v. Des Moines Independent Community School District,* 393 U.S. at 508, 89 S.Ct. at 737. Moreover, a school official permissibly may act upon his judgment that the school simply cannot accommodate all requests for time and space in the limited forum. This may entail content-based decision-making. *See, e.g., Board of Educ., Island Trees Union Free School District v. Pico,* 102 S.Ct. at 2814 n. 1 (Blackmun, J., concurring); *id.* 102 S.Ct. at 2829 (Rehnquist, J. dissenting). While content-based decisions *may* be permissible in such instances, *see Widmar v. Vincent,* 454 U.S. at 278–79, 102 S.Ct. at 278–79 (Stevens, J., concurring), it is significant that the defendants in this case claim neither that Petros cannot be accommodated because of time or space limitations nor that the group would disrupt the high school's educational mission in any way.

Perhaps the most apparent difference between high schools and universities is the role of administrators in making curricular choices. Of course, the high school curriculum is more structured than that of a university. *Cf. Board of Educ., Island Trees Union Free School District v. Pico,* 102 S.Ct. at 2830–31 (Rehnquist, J., dissenting) ("Unlike university ... libraries, elementary and secondary school libraries are not designed for free-wheeling inquiry; they are

tailored, as the public school curriculum is tailored, to the teaching of basic skills and ideas). Relying upon "their duty to inculcate community values," high school administrators justifiably may make content-based decisions with respect to curricular choices. *Id.* 102 S.Ct. at 2809 (plurality opinion). If the alleged forum is, in reality, a mere extension of the curriculum, it would make perfect sense to permit an administrator to decide what shall be included on the basis of content. *See e.g., Seyfried v. Walton,* 668 F.2d 214, 216 (3d Cir.1981) (where school play is "integral part" of curriculum, as opposed to "non-program related expressions of opinion," it is analogous to courses offered by school and a content-based decision to prohibit its presentation does not implicate First Amendment rights of students). As a practical matter, however, if an "activity period" can be considered part of the curriculum, it probably will not be deemed to be a "forum generally open for use by student groups." *See generally Widmar v. Vincent,* 454 U.S. at 267, 102 S.Ct. at 272. Hence, a content-based exclusion in such circumstances would not be scrutinized under the compelling state interest standard.

Notably, in the present case, the defendants do not claim that the activity period is a "program-related" function of the school, and they do not contend that the exclusion of Petros was based in any way upon curricular concerns. *The only justification offered for the exclusion is that the school does not wish to violate the Establishment Clause.* This being the case, the court can find nothing to preclude the application of *Widmar* in this, a high school, context. Accordingly, the court must inquire whether the content-based restriction is narrowly drawn and justified by a compelling state interest. The *Widmar* Court observed that a school's interest in fulfilling its obligations pursuant to the Establishment Clause "may be characterized as compelling." 454 U.S. at 271, 102 S.Ct. at 275. Having found no Establishment Clause problem, however, the Court did not reach the question whether these obligations rise to the level of a "compelling state interest" sufficient to jus-

tify a content-based exclusion of speech. *Id.* at 273 n. 13, 102 S.Ct. at 276 n. 13.[11] In the present case, then, this court initially must examine the Establishment Clause implications that would arise from a decision by the defendants to allow Petros to meet. If such a decision would not contravene the clause, there will be no need to go further. The plaintiffs will be entitled to the relief that they seek.

### ESTABLISHMENT CLAUSE DEFENSE

The defendants argue that to allow Petros to meet at the high school would violate the three-pronged test set forth in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The plaintiffs, heavily relying upon the Supreme Court's decision in *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) argue not only that recognition of "Petros" would not transgress the constraint of the Establishment Clause but that the failure to recognize the group violates the Establishment Clause.

■ The Establishment Clause of the United States Constitution provides "Congress shall make no law respecting an establishment of religion," U.S. Const. Amend. 1, and is applicable to the states through the Fourteenth Amendment. *See Cantwell v. Connecticut,* 310 U.S. 296, 303,

60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). The Supreme Court has established a tripartite test for determining whether a governmental policy transgresses the Establishment Clause: "First, the [policy] must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, [it] must not foster 'an excessive government entanglement with religion.'" *Lemon v. Kurtzman, supra,* 403 U.S. at 612–13, 91 S.Ct. at 2111; *see Larson v. Valente,* 456 U.S. 228, 252, 102 S.Ct. 1673, 1687, 72 L.Ed.2d 33 (1982); *Committee for Public Education v. Regan,* 444 U.S. 646, 653, 100 S.Ct. 840, 846, 63 L.Ed.2d 94 (1980); *Walz v. Tax Commission,* 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970). If a governmental policy fails to pass even one of the prongs of the *Lemon* test, it must be held violative of the Establishment Clause. *See, e.g., Committee for Public Education v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); *Lemon v. Kurtzman, supra,* 403 U.S. at 612, 91 S.Ct. at 2111; *School District of Abington Township v. Schempp,* 374 U.S. 203, 222–27, 83 S.Ct. 1560, 1571–74, 10 L.Ed.2d 844 (1963). The court shall examine each of the *Lemon* factors in turn.

■ The initial inquiry in an Establishment Clause analysis is whether the policy

---

11. In *Brandon v. Board of Educ.,* 635 F.2d 971 (2d Cir.1980), *cert. denied,* 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 109 (1981), the Second Circuit observed that the Establishment Clause provides the needed compelling state interest to outweigh a free exercise claim asserted by students. 635 F.2d at 978. The *Brandon* Court cited the Supreme Court's decision in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). This court respectfully disagrees with the view that *Sherbert* stands for this proposition. The *Brandon* opinion indicates that the Second Circuit maintains the same position regarding free speech claims. 635 F.2d at 980 ("sensitive Establishment Clause considerations limit [students'] right[s] to air religious doctrines"). It is unclear whether the *Brandon* court believed that the Establishment Clause provides a compelling interest with respect to free speech or simply limits the free speech rights of students in the first instance. However, Judge Kaufman, the author of the *Brandon* opinion, observed nearly ten years earlier, "[i]t is characteristic of reso-

lutions of first amendment cases, where the price of freedom of expression is so high and the horizons of conflict between countervailing interests seemingly infinite, that they do not yield simplistic formulas or handy scales for weighing competing values." *James v. Board of Educ.,* 461 F.2d 566, 575 (2d Cir.), *cert. denied,* 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 491 (1972) (holding that school board cannot prevent teacher from wearing armband to protest war without showing that such conduct threatens legitimate interests in regulating curriculum or preserving order). In any event, inasmuch as *Brandon* is not binding upon this court, it is unnecessary to attempt to resolve the question. The court will merely note that some of the Second Circuit's comments do not survive the Supreme Court's *Widmar* decision. *Compare* 454 U.S. at 269 & n. 6, 102 S.Ct. at 274 & n. 6 ("prayer" is protected "speech") *with* 635 F.2d at 980 (finding distinction between "prayer" and "discussions about religious matters" to be "compelling").

at issue has a secular purpose. Defendants argue that its authorization of "Petros", a nondenominational prayer group whose purpose is to promote spiritual growth, would fail this portion of the *Lemon* test because this club is religious and *a fortiori* nonsecular in nature. Such an argument, however, misconceives the nature of the inquiry. The question is not whether an individual's activity can be characterized as having a religious purpose. Rather, the focus is whether the government policy which *allows* the activity has a secular purpose. *See Widmar v. Vincent, supra,* 454 U.S. at 271, 102 S.Ct. at 275; *Committee for Public Education v. Regan,* 444 at 654, 100 S.Ct. at 846; *Mueller v. Allen,* 676 F.2d 1195, 1198 (8th Cir.1982); *Brandon v. Board of Educ.,* 635 F.2d at 978; *Florey v. Sioux Falls School District,* 619 F.2d 1311, 1314–15 (8th Cir.1980). The nonsecular purpose of the activity itself would be determinative of the secularity of the governmental. policy only if the policy is adopted with a view toward promoting the nonsecular activity. *See Stone v. Graham,* 449 U.S. 39, 41–42, 101 S.Ct. 192, 193–94, 66 L.Ed.2d 199 (1980); *School District of Abington Township v. Schempp,* 374 U.S. at 223, 83 S.Ct. at 1572; *Engel v. Vitale,* 370 U.S. 421, 424–25, 82 S.Ct. 1261, 1263–64, 8 L.Ed.2d 601 (1962); *American Civil Liberties Union v. Rabun County Chamber of Commerce,* 678 F.2d 1379, 1390 (11th Cir.1982); *Lubbock Civil Liberties Union v. Lubbock Independent School District,* 669 F.2d 1038, 1044–45 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 800, 74 L.Ed.2d 1003 (1983); *Karen B. v. Treen,* 653 F.2d 897, 900–01 (5th Cir. 1981), *aff'd,* 455 U.S. 913, 102 S.Ct. 1267, 71 L.Ed.2d 455 (1982); *Gilfillan v. City of Philadelphia,* 637 F.2d 924, 929–30 (3d Cir.1980), *cert. denied,* 451 U.S. 987, 101 S.Ct. 2322, 68 L.Ed.2d 845 (1981). Such is plainly not the case here.

The school's policy of allowing student groups to meet during the activity period was not adopted to provide a forum for religious discussion. Indeed, the policy long predated Petros' request. Moreover, the instant suit would seem to belie any such conclusion. The situation at bar is distinguishable from that presented in *Lubbock Civil Liberties Union v. Lubbock Independent School District, supra,* 669 F.2d 1038. The policy at issue in *Lubbock* "appear[ed] in the middle of a policy concerned with religious activities in the schools. The preamble to the policy is obviously concerned with religious beliefs and the place of *religion* in the public schools. The language ... indicates that the *focus* of this paragraph is with students who wish to meet for educational, *religious,* moral and ethical purposes." *Id.* at 1044–45 (footnote omitted) (emphasis· in original). Although the policy in *Lubbock* was ostensibly designed to allow many groups to meet, when it was examined in the context of the total school policy, its nonsecular purpose became apparent. No such facts are present in this case. Moreover, the *Lubbock* court's conclusion that a nonsecular purpose was present cannot be divorced from that school district's prior practices of lending vigorous support to religion. *See id.* at 1039–41. A similar history is conspicuously absent in the present case.

The avowed purpose of the Williamsport High School's policy in creating the activity period was to promote the intellectual, physical and social development of its students. There are no facts in the record to indicate that this declaration is inaccurate or self-serving. The purpose of this open forum is thus a secular one. *Accord Brandon v. Board of Educ.,* 635 F.2d at 978. The mere fact that a religious group wishes to take advantage of this forum by gaining access to it on the same basis as other groups does not convert the policy's aim into a nonsecular one. *See Widmar v. Vincent, supra,* 454 U.S. at 271–72 n. 10, 102 S.Ct. at 275–76 n. 10; *Brandon v. Board of Educ.,* 635 F.2d at 978.

The second inquiry is whether the challenged government policy would have the "primary effect" of advancing religion. Under this prong of the *Lemon* test, the policy will be upheld if it merely "accommodates" religion. Neither hostility toward nor advancement of religion is permitted. The distinction between advancement and

accommodation is often a difficult one to make. Nevertheless, the distinction exists, and is one which makes a constitutional difference. *Compare Zorach v. Clauson,* 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952) *with Illinois ex rel. McCollum v. Board of Educ.,* 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948). Hence, although the line separating accommodation from advancement sometimes appears blurred, it is a line which must be drawn, and drawn with as much precision as logic and precedent will allow.[12] Defendants argue that by allowing Petros to meet during the activity period they would cross the line between accommodation and advancement. Specifically, they contend that the nature of a high school and the age of its students, are such that allowing Petros to meet would put an "imprimatur" of state approval on its activity and, accordingly, have the primary effect of advancing religion.

In *Widmar v. Vincent, supra,* the Supreme Court rejected a state university's contention that a decision to accord to religious groups a right of equal access to its public forum would have the primary effect of advancing religion. 454 U.S. at 273, 102 S.Ct. at 276. Finding instead that any religious benefit of the university's open forum would be "incidental," the Court relied on two factors:

First, an open forum in a public university does not confer any imprimatur of State approval on religious sects or prac-

tices. As the Court of Appeals quite aptly stated, such a policy "would no more commit the University . . . to religious goals," than it is "now committed to the goals of the Students for a Democratic Society, the Young Socialist Alliance," or any other group eligible to use its facilities. 635 F.2d at 1317.

Second, the forum is available to a broad class of nonreligious as well as religious speakers; there are over 100 recognized student groups at UMKC. The provision of benefits to so broad a spectrum of groups is an important index of secular effect. *See, e.g., Wolman v. Walter,* 433 U.S. 229, 240–41 [97 S.Ct. 2593, 2601, 53 L.Ed.2d 714 (1977)] (1977); *Committee for Public Education v. Nyquist, supra,* at 781–82 and n. 38 [93 S.Ct., at 2955, 2969–70]. If the Establishment Clause barred the extension of general benefits to religious groups, "a church could not be protected by the police and fire departments, or have its public sidewalk kept in repair." *Roemer v. Maryland Public Works Bd., supra* [426 U.S. 736] at 747 [96 S.Ct. 2337, at 2345, 49 L.Ed.2d 179] (plurality opinion) quoted in *Committee for Public Education v. Regan,* 444 U.S. at 658 n. 6 [100 S.Ct. at 849 n. 6]. At least in the absence of empirical evidence that religious groups will dominate UMKC's open forum, we agree with the Court of Appeals that the advancement of religion would not be the forum's "primary effect."

---

**12.** Under the traditional meanings of the terms "accommodation" and "advancement," the instant question could be resolved without extended analysis. An "accommodation" is "something supplied for convenience or to satisfy a need," while an "advancement" is an action taken "to accelerate the growth or progress" of something. *See* Webster's New Collegiate Dictionary (G & C Merriam Co. 1979). Given the fact that the plaintiffs submitted their request without being encouraged by any form of government impetus, it is difficult to see how the school board would "advance" religion by granting the request. Rather, it would "accommodate" religion by supplying to the plaintiffs a convenience already granted to all other student groups. Such passive conduct lacks the elements of endorsement, furtherance or support implicit in the definition of "advancement." Accordingly, un-

less every "accommodation" is to be treated as an "advancement" of that which is being accommodated, the defendants clearly could allow the plaintiffs to meet.

Notwithstanding their ordinary definitions, however, the words "accommodation" and "advancement" have appeared to acquire a different meaning in this area of the law. For instance, an "accommodation" may be regarded as an "advancement" of religion if the government's decision to supply a convenience or recognize a need *appears* to represent an endorsement or furtherance of religion, *viz.,* the "imprimatur" concept. *See* discussion in text, *infra.* Accordingly, the court feels obliged to disregard traditional notions of "accommodation" and "advancement" and refer exclusively to the case law which defines these terms in the specialized context of the Establishment Clause.

454 U.S. at 274–75, 102 S.Ct. at 277 (footnotes omitted).

As was the case in *Widmar,* the Williamsport Area High School activity period evinces "an important index of secular effect" in that it is open to "a broad . . . spectrum of student groups." *See id.* at 274, 102 S.Ct. at 276. While the number of groups presently using the period is smaller than that involved in *Widmar,* it is not so small as to prevent the court from finding a "broad" class. Indeed, it is natural to expect that a high school would have a smaller number of these organizations, given that the student body is smaller and is drawn from a more narrow population base than usually is the case with a university. The number of groups presently using the activity period exceeds twenty-five. More importantly, these groups span a wide range of interests, including, *inter alia,* sports, government, social service, dramatics, journalism, language and music. The scope of the activity period at issue here is limited only by the range of students' interests. The school has expressed a great willingness to recognize and accommodate those interests. This, of course, is supported by the fact that the principal has never denied the use of school facilities to any group and has indicated that he would only do so if required by law.

Given the range of interests accommodated by the activity period, the court believes that like treatment of Petros would confer only a "general benefit" upon it rather than furthering its aims. The general benefit Petros seeks is the availability of a room during this part of the school day. In addition, it seeks the administration's passive acquiescence—leaving them to pray and discuss matters that concern the religious aspect of their lives. In essence, these students want the government passively to acknowledge that they have religious interests, just as others are "benefiting" from the government's recognition that they are interested in sports, journalism or the theatre. By recognizing that students have these religious interests, the school would not be "advancing" religion in the Establishment Clause sense, for the Constitution itself recognizes the existence of such interests. Any advancement of religion would come from the students themselves, and this the Establishment Clause does not bar, it being a limitation on government conduct rather than on individual activity.

Although the plaintiffs seek what they call "equal access," it is important to emphasize that they really seek something less than "equal" treatment. Apparently realizing that certain government support would indeed lead to an "advancement" of religious ideals, they do not ask for *all* that another group might obtain. While a sports team might seek a coach, Petros does not demand an instructor. While a drama club might seek a script, Petros does not demand a Bible, the Koran, or other religious text. While a journalism club might seek paper and ink, Petros does not demand a Star of David, a cross or other religious articles. What Petros demands are the three things accorded to *every* student organization—time, space and the permission to use them.

The mere fact that a small portion of public funds would be expended for the lighting and heating of the facility to be used by Petros does not, standing alone, indicate that the primary effect of an equal access policy would be to advance religion. The Supreme Court in *Widmar* rejected the district court's conclusion that *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) stood for the proposition "that state funds may not be used to provide or maintain buildings used by religious organizations." 454 U.S. at 272–73 n. 12, 102 S.Ct. at 275–76 n. 12. "[N]othing in *Tilton* suggested a limitation on the State's capacity to maintain forums equally open to religious and other discussions. Cases before and after *Tilton* have acknowledged the right of religious speakers to use public forums on equal terms with others. *See, e.g., Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981); *Saia v. New York,* 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948)." *Widmar v. Vincent,* 454 U.S. at 272–73 n. 12, 102 S.Ct. at 275–76 n.

12.[13] *See also School District of Abington Township v. Schempp,* 374 U.S. at 261–62, 83 S.Ct. at 1592 (Brennan, J., concurring).

Accordingly, the court concludes that the number and spectrum of student groups at the Williamsport Area High School is sufficiently broad to indicate that recognition of Petros would benefit religion only incidentally. *See Public Funds for Public Schools of New Jersey v. Byrne,* 590 F.2d at 522 (Weis, J., concurring) ("if a particular legislative enactment . . . provides clearly observable secular benefits, then religious institutions should not be barred solely because of their status").

The other factor relied on by the *Widmar* Court in concluding that an open forum does not transgress the "primary effects" test was the lack of "any imprimatur of State approval on religious sects or practices." 454 U.S. at 274, 102 S.Ct. at 276. Consideration of this factor in the instant case is more difficult than in *Widmar,* as this case involves high school students. *See id.* at 274 n. 14, 102 S.Ct. at 276 n. 14. To this task the court now turns.

It has been suggested in some cases that school-aged children lack sufficient maturity to understand that activity taking place on school premises does not always carry with it an imprimatur of state approval on these practices. *See, e.g., Lubbock Civil Liberties Union v. Lubbock Independent School District, supra,* 669 F.2d at 1045–47; *Brandon v. Board of Education, supra,* 635 F.2d at 978; *Johnson v. Huntington Beach Union High School District, supra,* 137 Cal. Rptr. at 49–50. In *Widmar v. Vincent, supra,* the Court dispelled the notion that college-aged students could not appreciate that a university's equal access policy did not imply approval—tacit or otherwise—of the various groups' activities.

Here the students who may "perceive approval" are not yet adults. However, this court cannot accept the notion that, under the circumstances of this case, high school

students would perceive the "open forum" policy as tacit endorsement by school officials of a club's religious activity. Cases, such as *Engel v. Vitale, supra,* and *School District of Abington Township v. Schempp, supra,* in which the "imprimatur" of state approval was relied on, in part, to invalidate the activity under the Establishment Clause involved both secondary and elementary schools. Certain generalizations made in those cases involved not only the maturity levels of high school students but of elementary school students as well. While this case does not involve students at the college age, neither does it involve children in the primary grades. Moreover, in the twenty years since *Engel* and *Abington,* high school students have become more advanced. While they are not yet adults, they should not be treated as infants. As Judge Rosenn recently observed in another context:

> [T]he court can take judicial notice of the progressively higher levels of intellectual and emotional development of students in the latter grades of secondary schools. As a result, more deference should be shown school authorities' curricular decisions regarding grade school, and perhaps junior high school students, in the face of a challenge that a particular point of view has been excluded. High school students, in contrast, are at an age approaching both adulthood and franchise. As the Second Circuit has noted in a related context, "It would be foolhardy to shield our children from political debate and issues until the eve of their first venture into the voting booth. Schools must play an essential role in preparing their students to think and analyze and to recognize the demagogue." *James v. Board of Education,* 461 F.2d 566, 574 (2d Cir.), *cert. denied,* 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 491 (1972).

*Seyfried v. Walton,* 668 F.2d 214, 219–20 (3d Cir.1981) (Rosenn, J., concurring) (footnote omitted); *accord, Russo v. Central School*

---

**13.** *Cf. Wolman v. Walter,* 433 U.S. 229, 240, 97 S.Ct. 2593, 2601, 53 L.Ed.2d 714 (1977); *Roemer v. Board of Public Works of Maryland,* 426 U.S. 736, 747, 96 S.Ct. 2337, 2345, 49 L.Ed.2d

179 (1976); *Meek v. Pittenger,* 421 U.S. 349, 360, 95 S.Ct. 1753, 1760, 44 L.Ed.2d 217 (1975); *O'Hair v. Andrus,* 613 F.2d 931 (D.C.Cir.1979).

*District No. 1,* 469 F.2d 623, 633 (2d Cir. 1972), *cert. denied,* 411 U.S. 932, 93 S.Ct. 1899, 36 L.Ed.2d 391 (1973); *Wilson v. Chancellor,* 418 F.Supp. 1358, 1368 (D.Ore. 1976); *Bayer v. Kinzler,* 383 F.Supp. 1164, 1166 (E.D.N.Y.1974), *aff'd mem.,* 515 F.2d 504 (2d Cir.1975). *But see Brandon v. Board of Education of, the Guilderland School District,* 635 F.2d at 978.

In addition to the higher level of maturity, the factual situation at bar is materially different from the facts involved in the Supreme Court's well-known "schoolprayer" cases. In *Illinois ex rel. McCollum v. Board of Education,* 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948), for example, a school board *required* religious instruction periods to be held each week in the classrooms using outside religious instructors under the supervision of the school district superintendent. Although participation in the program was voluntary—those who did not wish to participate retired elsewhere for secular instruction—the students were, in effect, placed in two categories, *i.e.,* those taking religious instruction and those who were not. Similarly, *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) involved a program in the New York State schools whereby a prayer—*composed by the state*—was *required* to be recited in the public schools at the beginning of each day. Here again, the participation while nominally voluntary, forced students to be classified as religious or nonreligious. Finally, *School District of Abington Township v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) presented a challenge to state statutes *requiring* the reading of verses from the Bible at the commencement of the school day. Although participation was voluntary, the exercise was mandatory with the resultant religious/nonreligious classification.

Clearly then, *Engel, Schempp* and *McCollum* involved religious activity not merely allowed by the state but required by it. In each case, the activity took place en masse—the students were all assembled in their respective classrooms so that those who did not wish to participate had to conspicuously absent themselves—and the exercises were. actively participated in by the teachers. Although the Supreme Court has noted that the presence or absence of state coercion is not dispositive in Establishment Clause cases, such a factor appears important in gauging the likelihood that the government will be taken to have placed its imprimatur on a given religious practice.

The situation at bar is fundamentally different from the traditional school prayer cases. Williamsport Area High School's open forum policy would not permit the type of en masse recitation of religious doctrine at the start of the school day, such as in *Engel, Schempp* and *Karen B. v. Treen,* 653 F.2d 897 (5th Cir.1981), *aff'd mem.,* 455 U.S. 913, 102 S.Ct. 1267, 71 L.Ed.2d 455 (1982) or during school assemblies, such as in *Collins v. Chandler Unified School District,* 644 F.2d 759 (9th Cir.), *cert. denied,* 454 U.S. 863, 102 S.Ct. 322, 70 L.Ed.2d 163 (1981). Moreover, an equal access policy would not force a choice between participating in a "religious" group, such as Petros or a secular one. *Cf. School District of Abington Township v. Schempp, supra,* 374 U.S. at 223, 83 S.Ct. at 1572; *Engel v. Vitale, supra,* 370 U.S. at 430, 82 S.Ct. at 1266; *Illinois ex rel. McCollum v. Board of Education, supra,* 333 U.S. at 208–09, 68 S.Ct. at 463–64; *Karen B. v. Treen, supra,* 653 F.2d at 899. The record in this case reveals that the students not only have a choice among many group activities but may choose not to participate in any club. Instead, the time may be used as a study period, to do homework, to read in the library or receive extra help from a teacher. Deposition of Wayne A. Newton, Document 16 of the Record at p. 10. The lack of en masse activity together with the more varied alternatives reduces any perception of state approval or student embarrassment.

Moreover, it appears that Petros is willing to occupy a less favorable position among the various other organizations using school facilities. For instance, the exhibits submitted to the court demonstrate that many of the student activities are described in the school yearbook. The year-

book names the individuals associated with each activity, sets forth pictures depicting various functions and describes the successes achieved by the groups during the previous school year. The plaintiffs have represented that they are willing to do without these benefits. They have advised the court that they would not complain if they are also left out of the school newspaper. Finally, they have represented through counsel that they will not request access to the school's public address system to announce the times and places of their meetings to the student body. These factors support the conclusion that the students in this high school are not likely to view the Petros meetings as an endorsement of religion by the school. The defendants have offered no evidence tending to show that Petros would be viewed as an organization that is being granted anything more than an accommodation by the school administration. Hence, the school's policy of providing a forum to be used in common by all student groups "may fairly be viewed as reflect[ing] a neutral posture toward religio[n]." *Committee for Public Education v. Nyquist,* 413 U.S. 756, 782, 93 S.Ct. 2955, 2970, 37 L.Ed.2d 948 (1973). *See also id.* at 782 n. 38, 93 S.Ct. at 2970 n. 38 (distinguishing *Nyquist* from *Board of Education v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) and *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) on the basis that the class of beneficiaries in those cases included *all* school children). Indeed, to say that Petros *alone* is barred from utilizing the forum created by the Williamsport Area High School could manifest a hostility toward religion. *See Lubbock Civil Liberties Union v. Lubbock Independent School District,* 680 F.2d 424, 426 (5th Cir.1982) (Reavley, J., dissenting from a Denial of Rehearing En Banc). The Establishment Clause acts as a proscription against hostility to, as well as advancement of, religion. *See Committee for Public Education v. Regan,* 444 U.S. at 653, 100 S.Ct. at 846; *Epperson v. Arkansas,* 393 U.S. at 104, 89 S.Ct. at 270; *School District of Abington Township v. Schempp,* 374 U.S. at 218–19, 83 S.Ct. at 1569.

Another factor militating against a finding that the school will place its imprimatur upon Petros' activities is that, unlike *Engel* and *Schempp,* the policy herein has a clear secular purpose. While the existence of a secular purpose does not, of course, foreclose a finding of "advancement of religion," it diminishes the risk that the public will perceive the state policy as an "advancement" or "approval" of a particular religion or religious practice. *Cf. Florey v. Sioux Falls School District,* 619 F.2d at 1316 (when primary purpose of a given school activity is secular, the activity does not have the primary effect of advancing religion by the inclusion of some religious content); *Gilfillan v. City of Philadelphia,* 637 F.2d at 931 n. 6 (design of platform for papal visit to include cross relevant both to purpose and effect of city's action). For example, in *School District of Abington Township v. Schempp, supra,* the Court focused on the nonsecular purpose of the Bible reading exercise in striking the law down. While the Court also spoke in terms of the primary effect of the law, 374 U.S. at 222, 83 S.Ct. at 1571, the imprimatur of state approval in *Schempp* could not be totally divorced from the patently nonsecular purpose of the law. *See generally id.* at 288, 83 S.Ct. at 1606 (Brennan, J., concurring) ("excusal or exemption simply has no relevance to the establishment question, *if it is once found that these practices are essentially religious exercises designed at least in part to achieve religious aims*") (emphasis added).

The Supreme Court has recognized that within the confines of the Establishment Clause "there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference." *Walz v. Tax Commission,* 397 U.S. at 669, 90 S.Ct. at 1412. This court believes that the present case falls within that "room of neutrality." To paraphrase the *Widmar* Court: "It is possible—perhaps even foreseeable—that [Petros] will benefit from access to [high school] facilities. [But] ... a religious organization's enjoyment of merely

'incidental' benefits does not violate the prohibition against the 'primary advancement' of religion." 454 U.S. at 273, 102 S.Ct. at 276. The direct and immediate effect of allowing Petros to meet would not be an endorsement of religion but rather a furtherance of the students' noncurricular development. Not unlike the bus transportation reimbursement in *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) and the textbook loan program in *Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), an equal access policy affords to all students the benefit of using school facilities. The benefit in this case furthers the students' personal development by allowing them to convene in the pursuit of a common interest.[14] *See generally Widmar v. Vincent, supra,* 454 U.S. at 273, 102 S.Ct. at 276.

The final inquiry is whether the policy at issue involves "excessive entanglement." *See, e.g., Larson v. Valente,* 456 U.S. at 255, 102 S.Ct. at 1688; *Roemer v. Board of Public Works of Maryland,* 426 U.S. at 762, 96 S.Ct. at 2352; *Walz v. Tax Commission,* 397 U.S. 674–75, 90 S.Ct. at 1414 (1970). In support of their contention that recognizing and allowing Petros to meet would require excessive entanglement with religion, defendants point to two factors: the expenditure of public funds in providing a place for Petros to meet and the necessity of a teacher to monitor the meetings. The Court has previously examined the defendants' expenditure of funds argument and the reasons for its rejection need not be repeated. It suffices to say that the Establishment Clause does not prohibit a de minimis expenditure from the public fisc to *incidentally* aid religion.

The plaintiffs have requested that "a faculty advisor ... be present at [Petros'] meetings solely for purposes of ensuring good order and not for any purpose related to the religious content of the meetings." *See* Complaint ¶ 57(C), Document 1 of the Record. The court does not believe that this would involve excessive entanglement. Inasmuch as the teacher would be present only to ensure orderly meetings,[15] the instant situation would involve no more entanglement than when a state provides for "the safety, security and general convenience" for persons attending the celebration of a Mass at the National Mall, *see O'Hair v. Andrus, supra,* 613 F.2d at 935, or provides police and fire protection to a church, *see Roemer v. Board of Public Works of Maryland,* 426 U.S. at 747, 96 S.Ct. at 2345; *Everson v. Board of Education,* 330 U.S. at 17, 67 S.Ct. at 512. The teacher chosen to "monitor" the meetings would be the functional equivalent of a policeman at a religious rally held in a public park, *see generally id.; O'Hair v. Andrus,* 613 F.2d at 935. Just as the policeman in the above situation is acting to fulfill an obligation to society by ensuring peaceful discussion, so too would a teacher acting as a monitor during Petros' meetings be fulfilling an obligation to the school by maintaining order among the students. While the teacher's presence certainly would involve some "entanglement" with the meetings, such "limited and incidental entanglement between church and state authority is inevitable in a complex modern society." *Larkin v. Grendel's Den, Inc.,* —— U.S. ——, 103 S.Ct. 505, 510, 74 L.Ed.2d 297 (1982) (citing *Lemon v. Kurtzman,* 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971); *Walz v. Tax Commission,* 397 U.S. 664, 670, 90 S.Ct. 1409, 1412, 25 L.Ed.2d 697 (1970)). In short, the "entanglement" would not be "excessive."

Moreover, the court has been informed by plaintiffs that they would be willing to withdraw the request for an "advisor" if necessary to avoid an excessive entangle-

---

**14.** The common interest asserted by these plaintiffs is "to promote spiritual growth and positive attitudes in the lives of its members." Exhibit 3 to Document 8 of the Record.

**15.** According to the uncontroverted affidavit of Lisa Bender, the teacher present at the first meeting of Petros did not take part in any of the discussion. Rather, the teacher took attendance and spent the remaining time grading papers. *See* Affidavit of Lisa Bender, Document 24 of the Record at 2.

ment problem. It appears then that the request for a monitor was prompted by the defendants' "unwritten policy" that an adult must be present at student meetings. There being no problem of entanglement in any event, it is unnecessary to address the plaintiffs' proposal.

The court having reviewed each prong of the tripartite *Lemon* test, and having found no potential violation thereof, the defendants' "Establishment Clause defense" must fail. Accordingly, the defendants have not enunciated a constitutionally-acceptable justification for their content-based exclusion of the plaintiffs from the benefits of the activity period. Therefore, the plaintiffs are entitled to summary judgment.

### CONCLUSION

The court is fully aware that the result reached in this case will not be free from doubt unless and until the Supreme Court clarifies two very important areas of the law—the extent to which there can be a "forum" for students in our high schools and the status of prayer in those institutions when initiated by students acting independently of outside influences. It may seem unusual that this case is so difficult to resolve, for *Widmar* appears nearly "on point." But for the fact that the present dispute involved a high school, *Widmar* clearly would have controlled. By the same token, it can be argued that *Engel* and *Schempp* should have governed the disposition of this case. But for the fact that the instant situation involved a purely student-initiated request to use a forum created by the school, the "school prayer" cases may very well have been dispositive. As noted at the outset of this opinion, the facts of this case are crucial. Under these facts, the court believes that the scales have tipped in the direction of applying *Widmar* rather than the "school prayer" cases.

The instant decision is a narrow one. The court does not hold that the Establishment Clause can never provide the "compelling state interest" necessary to defeat an otherwise valid free speech claim. That question is an open one. The court does not hold that public high school students have an indefeasible right to form prayer groups in these institutions. They do not. The court does not hold that all high school activity periods are "limited forums" conferring the full panoply of free speech rights upon students. That question depends upon the facts presented. The court does not hold that "voluntary school prayer" is, in all instances exempt from the scope of the Establishment Clause. It is not.

The court merely holds that *under the precise set of undisputed facts presented,* the defendants have created an open forum for the students' use, have excluded the plaintiffs by reason of the content of their speech, and have not demonstrated that the Establishment Clause requires such discrimination. Chief Justice Burger once made a salient observation concerning the difficult task of reconciling the sometimes competing values embodied in the religion clauses of the Constitution. His words are well worth repeating in the present context, for another constitutional value has been drawn into the fray—freedom of speech:

> The Establishment and Free Exercise Clauses of the First Amendment are not the most precisely drawn portions of the Constitution. The sweep of the absolute prohibitions in the Religion Clauses may have been calculated; but the purpose was to state an objective, not to write a statute. In attempting to articulate the scope of the two Religion Clauses, the Court's opinions reflect the limitations inherent in formulating general principles on a case-by-case basis. The considerable internal inconsistency in the opinions of the Court derives from what, in retrospect, may have been too sweeping utterances on aspects of these clauses that seemed clear in relation to the particular cases but have limited meaning as general principles.

> The Court has struggled to find a neutral course between the two Religion Clauses, both of which are cast in absolute terms, and either of which, if extended to a logical extreme, would tend to

clash with the other. For example, in *Zorach v. Clauson,* 343 U.S. 306 [72 S.Ct. 679, 96 L.Ed. 954] (1952), MR. JUSTICE DOUGLAS, writing for the Court, noted:

"The First Amendment, however, does not say that in every and all respects there shall be a separation of Church and State." *Id.,* at 312 [72 S.Ct. at 683]. "We sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma." *Id.,* at 313 [72 S.Ct. at 683].

MR. JUSTICE HARLAN expressed something of this in his dissent in *Sherbert v. Verner,* 374 U.S. 398 [83 S.Ct. 1790, 10 L.Ed.2d 965] (1963), saying that the constitutional neutrality imposed on us

"is not so narrow a channel that the slightest deviation from an absolutely straight course leads to condemnation." *Id.,* at 422 [83 S.Ct. at 1803].

The course of constitutional neutrality in this area cannot be an absolutely straight line; rigidity could well defeat the basic purpose of these provisions, which is to insure that no religion be sponsored or favored, none commanded, and none inhibited. The general principle deducible from the First Amendment and all that has been said by the Court is this: that we will not tolerate either governmentally established religion or governmental interference with religion. Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference.

Each value judgment under the Religion Clauses must therefore turn on whether particular acts in question are intended to establish or interfere with the religious beliefs and practices or have the effect of doing so.

*Walz v. Tax Commission,* 397 U.S. at 668–69, 90 S.Ct. at 1411.

The court believes that the present result falls within the realm of what the Chief Justice called "a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference."

An appropriate Order will enter.